Filed 3/8/13  Spinner v. American Broadcasting CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ANTHONY SPINNER, | B239229 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC 417577) |
| v. | |
| AMERICAN BROADCASTING COMPANIES, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kevin C. Brazile, Judge.  Affirmed.

Susman Godfrey, Steven G. Sklaver and Oleg Elkhunovich for Plaintiff and Appellant.

Kelley Drye & Warren, Andrew M. White, David E. Fink, Allison S. Brehm and Joshua M. Keesan for Defendant and Respondent.

\* \* \* \* \* \*

Anthony Spinner brings this "idea submission" lawsuit against American Broadcasting Company, Inc. (ABC) for ABC's alleged use of his ideas in creating and developing the hit television series *LOST*.  Spinner submitted a script entitled "L.O.S.T." to ABC in 1977, while ABC's *LOST* was created and developed in 2003 and 2004. The trial court granted summary judgment in favor of ABC.  We affirm.

## STATEMENT OF FACTS

### 1.  *Spinner Drafts His Script and Submits It to ABC in 1977*

Spinner is a television producer, writer, and former studio executive in Los Angeles. He was nominated for an Emmy for Outstanding Drama Series as the executive producer of the series *Baretta*, an ABC television show.  Spinner is a former creative vice president at Fox Television.

Around 1976, Sid and Marty Krofft Television Productions, Inc. (SMK) approached Spinner through his agents because SMK and ABC were interested in developing a television pilot with Spinner.  During a meeting with SMK, Spinner explained that he "had always thought about doing people stranded in impossible circumstances, not contemporary, not like a hundred stories like that had been told, and how they would survive and the strange adventures they would meet there."  The SMK representatives liked the idea.  In December 1976, ABC entered into an agreement with SMK to retain Spinner to write a two-hour pilot tentatively entitled "L.O.S.T."  SMK was to pay Spinner $30,000 for his services and invoice ABC for that amount.  SMK and Spinner also entered into an agreement for Spinner to write "a proposed two hour television motion picture presently entitled L.O.S.T."

Spinner created a three-page outline of "Characters and Conflicts" for the pilot and a 10-page synopsis.  Richard Heller of SMK delivered these documents to two executives at ABC, Cliff Alsberg and Ken Gross.  At the time, Alsberg was vice president of Drama Development at ABC, and Gross was director of Drama Development.  Spinner met with Heller, Alsberg, and Gross at ABC, where they gave him some thoughts and suggestions. He then wrote a 121-page script entitled "Lost."  He met with Heller, Alsberg, and Gross again to discuss the script.  They provided some notes on the script, one major point being that they wanted "more awe and wonderment."  Spinner revised the script in response to

2

Alsberg's and Gross's notes and submitted the second draft to ABC around March or April 1977 (the 1977 Script). Heller told Spinner that Alsberg and Gross were very pleased with the 1977 Script.[1]

The 1977 Script is about a group of eight survivors connected to the U.S. Olympic team whose plane crash-lands deep in the Himalayas. The plane leaves from the Tokyo airport hours after an international competition. Five of the survivors are Olympic-bound athletes, one is the team physician, one is a television reporter, and one is the pilot. Among the athletes is a former military man who assumes leadership of the group, a spoiled rich girl with a drug addiction, and a strong-willed man who shows a temper and challenges the former military man's leadership of the group. The plane's radio is smashed in the crash. The survivors must seek shelter, because with the snow and wind, they are certain to freeze to death at the crash site. One survivor goes through a craggy tunnel in the mountainside and comes out the other side in a prehistoric world that "looks like a chunk of central Africa," except the world is inhabited by dinosaurs and flying reptiles. He returns to the other survivors, who collect a few supplies from the crash site and follow him back to the "lost world." As they enter the new world, an avalanche seals the tunnel behind them, cutting off their passage back to their world. The rest of the script tells the story of their attempt to survive in this new world, where they come up against creatures and primitive human beings.

Sometime after Spinner submitted the 1977 Script, ABC decided to pass on the project. Spinner was told the project was far too expensive for ABC to produce. Spinner never spoke with Gross about the 1977 Script ever again, and he never spoke with Alsberg about it again until 2005, after the television series *LOST* had premiered. Alsberg left ABC in 1979, and Gross left ABC in 1977. The television series *LOST* was not created until 2003 to 2004.

---

[1] We use the "1977 Script" from here on to refer collectively to both drafts of the script Spinner submitted to ABC in 1977.

ABC's record retention schedule with an effective date of January 19, 1972, states that it retains unclaimed scripts (scripts not returned to submitters) permanently. ABC did not return either draft of the 1977 Script to Spinner.

## 2. *Spinner Submits a New Idea in 1991 and 1994*

In 1991, Spinner resubmitted his idea to ABC. He verbally pitched the 1977 Script to Deborah Leoni, then director of Drama Series Development at ABC. Leoni suggested that he needed a new title and new spin on the project in order for her to be able to sell it to ABC. Spinner knew he had to change the project to such an extent that it would not be recognized as the 1977 Script. He then created a new eight-page treatment telling a futuristic story that takes place in 2060 (the Outer Space Treatment). A spaceship bound for the planet "Lambar" crash lands somewhere "in the vast Jadan galaxy" after it is ripped off course by a cosmic storm. Six human survivors of the crash and one android member of the crew struggle to survive in their new environment while faced with never-before-seen creatures, alien races, primitives, and other dangers. ABC passed on the Outer Space Treatment. In 1994, Spinner resubmitted the same treatment to ABC, this time to an executive named Greer Shephard, who had taken over Leoni's position, as well as to Leoni. ABC passed again on the Outer Space Treatment in 1994. In response to ABC's separate statement of undisputed material facts, Spinner admitted that the Outer Space Treatment and the *LOST* television show are not substantially similar in either plot, sequence of events, themes, characters, dialogue, mood, setting, or pace.

Shephard left ABC in 1997. Leoni left ABC in 1995. Leoni and Shephard were not involved in the creation, development, or production of the *LOST* television show. Neither one shared their communications with Spinner or any of Spinner's writings and ideas with the creators of *LOST* (Lloyd Braun, Damon Lindelof, J.J. Abrams, and Jeffrey Lieber).

Spinner has testified unequivocally that he had no contact with the creators of *LOST*. Specifically, his deposition testimony was as follows:

> "Q. . . . [¶] You don't contend that you've ever had any contact with anybody who participated in the production or creation of the 'LOST' television show, do you?
> "A. Never spoke to one of them, never met any of them.

4

"Q.  And you don't contend that you ever transmitted any of the materials surrounding the 1977 Script to anybody involved in the production of 'LOST,' do you?

"A.  I never did.

"Q.  And you don't contend that you ever submitted any of the materials that comprise the Outer Space Treatment to anybody involved in the production or creation of the television program 'LOST,' do you?

"A.  I do not contend that.

"Q.  In fact, as far as you're aware, you've never had any contact with anybody involved in the production or creation of 'LOST' at all; isn't that right?

"A.  That's right."

## 3. *ABC Develops the* LOST *Television Show*

### a. Lloyd Braun

Braun has worked in the entertainment industry for more than 25 years. He first started working for ABC Entertainment Television Group in July 1999. He was chairman of ABC Entertainment Television Group from January 2002 to April 2004. Braun does not know Spinner and has never communicated in any manner with Spinner. Prior to this lawsuit, he had never heard of Spinner. At no time while he was involved with *LOST* did anyone ever mention to him any script or treatment by Spinner, nor did anyone suggest to him that they knew anything about the contents of a script or treatment by Spinner. Braun has never read Spinner's 1977 Script or Outer Space Treatment. He has never spoken with or received any materials from Leoni, Alsberg, Gross, or Heller. He has never spoken with or received any materials from Shephard regarding any of Spinner's work or ideas.

Around late December 2002, early January 2003, Braun was vacationing in Hawaii. While sitting on the beach in Hawaii, he came up with the concept for *LOST*. The motion picture Cast Away (20th Century Fox 2000), about a survivor on a desert island, was on his mind. He thought about the concept of survivors of a crash landing on a deserted island. He also thought about the success of the unscripted reality television show *Survivor*, and decided to marry the two concepts, *Survivor* and Cast Away, together. He had the title "Lost" in his head from a 2001 failed reality television show of the same title.

In July 2003, Braun was at a company retreat and pitched the idea of "*Cast Away* -- the series" to other executives at a brainstorming session. He compared his idea to Cast

Away, *Survivor*, and *Gilligan's Island*, saying the show could have the inventiveness of *Gilligan's Island* with a Lord of the Flies (Columbia Pictures 1990) element. He pitched the show as a dramatization of how the "castaways" survive on the island, and they never make it off the island. The whole brainstorming session, including Braun's pitch, was transcribed by a reporting service.

**b. Jeffrey Lieber**

Lieber, a writer under contract with Spelling Entertainment at the time, was eventually assigned to work on a draft pilot for Braun's idea. Lieber does not know Spinner and has never communicated in any manner with Spinner. Prior to this lawsuit, he had never heard of Spinner. At no time while he was involved with *LOST* did anyone ever mention to him any script or treatment by Spinner, nor did anyone suggest to him that they knew anything about the contents of a script or treatment by Spinner. He has never read Spinner's 1977 Script or Outer Space Treatment. Prior to and during the time he was working on *LOST*, he did not have access to scripts submitted by other writers to ABC or scripts stored in ABC's archives. Lieber has never spoken with or received any materials from Leoni, Alsberg, Gross, or Heller. He has never spoken with or received any materials from Shephard regarding any of Spinner's work or ideas.

Around August 2003, Lieber began drafting an outline for Braun's proposed pilot. His vision for the project was inspired by the novel *Lord of the Flies*, which he characterizes as "a realistic portrayal of a group of survivors figuring out how to govern and rebuild a society following a disaster." He completed a general outline on or around September 23, 2003. This first outline included core elements such as (1) a small cast of plane crash survivors are stranded on a seemingly deserted tropical island, (2) the use of a plane fuselage as a setting, (3) competition for leadership roles among the survivors, (4) debate over who to save with limited medical supplies, and (5) mystery regarding the main characters' backgrounds. In addition, his outline included a group of core characters such as (1) a pregnant woman, (2) an older gentleman who is calm and collected, (3) a con man, (4) a doctor, (5) a drug addict, (6) a military officer, and (7) a spoiled rich girl.

After completing several more drafts of the outline and several drafts of the pilot script, Lieber submitted a revised draft of the script entitled "Nowhere" to ABC on or about December 23, 2003. Around a week later, he learned that Braun had issues with the script, and approximately a week after that, he submitted another revised version of the script to ABC. Shortly after that submission, Lieber learned that Braun was looking for something different and had decided to work with a different writer.

### c. J.J. Abrams and Damon Lindelof

Braun turned to Abrams when he was not satisfied with Lieber's work. Abrams has been a writer, producer, and director for television and film for over 20 years. Abrams does not know Spinner and has never communicated in any manner with Spinner. Prior to this lawsuit, he had never heard of Spinner. At no time while he was involved with *LOST* did anyone ever mention to him any script or treatment by Spinner, nor did anyone suggest to him that they knew anything about the contents of a script or treatment by Spinner. He has never read Spinner's 1977 Script or Outer Space Treatment. Prior to and during the time he was working on *LOST*, he did not have access to scripts submitted by other writers to ABC or scripts stored in ABC's archives, with the exception of Lieber's script. He did not read Lieber's script, however. Abrams has never spoken with or received any materials from Leoni, Alsberg, Gross, or Heller. He has never spoken with or received any materials from Shephard regarding any of Spinner's work or ideas.

In early January 2004, Abrams received a call from Braun regarding his idea for a show about people who survived a plane crash on an island. Abrams wanted to work on it but knew he would need someone to help him write it because of his busy schedule – he was running another television series at the time, *Alias*. On or about January 12, 2004, Abrams attended a meeting to flesh out ideas for the new show. There, he met Lindelof for the first time.

Lindelof has been a television and film writer for over 10 years. He does not know Spinner and has never communicated in any manner with Spinner. Prior to this lawsuit, he had never heard of Spinner. At no time while he was involved with *LOST* did anyone ever mention to him any script or treatment by Spinner, nor did anyone suggest to him that they

knew anything about the contents of a script or treatment by Spinner. He has never read Spinner's 1977 Script or Outer Space Treatment. Prior to and during the time he was working on *LOST*, he did not have access to scripts submitted by other writers to ABC or scripts stored in ABC's archives, with the exception of Lieber's script, which he read. Lindelof has never spoken with or received any materials from Leoni, Alsberg, Gross, Heller, or Shephard.

An ABC executive contacted Lindelof in early January 2004 and offered him the opportunity to meet with Abrams about possibly working together on a new show. When Lindelof and Abrams met on January 12, they immediately connected and started sharing ideas for the show in a rapid-fire fashion. Also present at the meeting were two writers and a producer from Abrams's show, *Alias*, and two executives from ABC -- Heather Kadin, vice president of Drama, and Thom Sherman, senior vice president, Drama Development. Lindelof's and Abrams's exchange of ideas at that meeting included the following: (1) the show would be rooted in mystery such that each character would have a mysterious background and his or her own story to tell; (2) the island itself would be a mysterious character, a supernatural place where strange things happened; (3) the characters' mysterious backgrounds would be revealed through a flashback device, focusing on one character's story per episode; (4) the show would begin with a man waking up on the island after the plane crash, and the details of the crash itself would gradually be revealed using the flashback device; and (5) characters on the show would include other people who were on the island before the plane crash, adding to the mystery of the island.

Lindelof drafted six pages of notes memorializing the ideas discussed at the meeting and circulated them by email to Abrams and the *Alias* writers and producer late the night after the meeting. The document contained ideas for the "overall concept": take Braun's "tentpole idea -- The Survivors of a plane crash find themselves on a desolate island in the middle of nowhere -- and give it legs." The show would explore "the unknown," and in addition to the normal rigors of desolate island life, the characters would experience ongoing mysteries. The characters would be enigmatic as well. The document also contained a section entitled "Characters" that set forth some of the main "good guys" and

8

"bad guys," including Jack, the male lead, who was to be intelligent, handsome, self-deprecating, and a natural born leader, and in later documents is a doctor; Kate, the female lead and "our hero"; Charlie, the antisocial "anti-hero" who is still one of the good guys, and in later documents is a drug addict; Mike and Walt, a father and his 11-year-old son, who had never had an opportunity to bond until this trip during which their plane crashed; Sawyer, "the heavy," who is competent, charismatic, and able, but shows hints of temper and violence; Djani, a technically skilled engineer, who in later documents becomes Sayid, a former Iraqi military officer; and Shannon, the "femme fatale" and "not your prototypical b--ch." Finally, the document also contained a section entitled "Weird S--t That Might Happen in the Pilot," including something very big moves through the trees in the distance; a horrifying noise wakes everyone up in the middle of the night and then abruptly stops; a "jerry-rigged" transmitter cannot transmit because a stronger signal transmitting from somewhere else on the island is blocking it, and the characters discover the other transmission is a distress call in French playing on a loop and recorded many years ago (in 1983).

Time was short if the show was going to be broadcast during the 2004 to 2005 television season. Typically, networks would have already selected scripts for pilots around December 2003, and principal photography would have commenced shortly thereafter. Lindelof and Abrams were thus tasked with drafting an outline by the end of the week. Between January 13 and 16, 2004, Lindelof created and circulated at least four separate versions of notes or draft outlines to Abrams and the *Alias* writers and producer who were also present at the meeting. On January 16, 2004, Lindelof sent a final version of a 21-page outline entitled "LOST" to Kadin and Sherman at ABC. Braun also received the outline and thought it was "brilliant." He called Lindelof the next day and told him ABC was going to produce the pilot based solely on the outline.

By January 19, 2004, Lindelof had created a rough cast list for the pilot and had started creating character "sides" for actors to read when auditioning for the show. In February 2004, while they were working on the pilot script, Abrams and Lindelof were conducting casting sessions for the show, and the actors they liked for certain characters

influenced the way they were writing those characters. The evolution of the first draft of the pilot script is documented in the record; in January and February 2004, as Lindelof finished each act of the script and revised the acts, he sent the drafts by email to Abrams and the *Alias* team. Abrams and Lindelof finished a complete first draft of the pilot script on February 24, 2004, and submitted it to Braun, Kadin, and Sherman. They revised the script numerous times and submitted the final script on April 19, 2004. By early May 2004, they and the *LOST* staff writers had created a "bible" that provided an overview of the show and described its general format, various elements of the show, character biographies, and approximately 30 ideas for the future of the show.

The pilot for *LOST* premiered in two parts on September 22 and 29, 2004. The series ran for six seasons, with the final episode airing in 2010.

### 4. *ABC Searches for Spinner's Work in Its Records*

Lisa Petraglia is executive director of Legal Affairs Administration at ABC. During the period 2007 to 2011, she supervised the searches conducted of ABC's files for any scripts, treatments, or other works by Spinner. ABC searched the hard copy and electronic files of the ABC personnel involved in the creation of *LOST*, as well as those involved with Spinner's submission of the 1977 Script and the Outer Space Treatment. Specifically, ABC searched the files of the Drama Development Department (including the files of Gross, Alsberg, Leoni, Shephard, and any files relating to SMK), the files of the former Literary Rights Department, and the files of Braun, Kadin, and Sherman, among others. The searches did not yield any iteration of the 1977 Script. The searches did yield a copy of the Outer Space Treatment, found in Leoni's files.

## PROCEDURAL HISTORY

Spinner filed the operative complaint on July 10, 2009, for breach of implied-in-fact contract against ABC and Touchstone Television Productions, Inc. He alleges that an implied-in-fact contract was created between him and ABC when ABC solicited the 1977 Script, he submitted the script with the reasonable expectation of payment if ABC used it, ABC accepted it knowing that he expected payment, and ABC used it. He further alleges that ABC had access to and used his 1977 Script to develop and produce the television

series *LOST*. He asserts that he is due an ongoing royalty for ABC's use of the ideas in his 1977 Script.

On or around August 31, 2011, ABC moved for summary judgment on three grounds: (1) the creators of *LOST* had no reasonable possibility of access to Spinner's work; (2) *LOST* is not substantially similar to Spinner's work; and, (3) even if there were triable issues of fact regarding access and substantial similarity, the undisputed evidence established that ABC independently created *LOST*, and independent creation was a complete defense to the action. The court granted summary judgment in favor of ABC and held that ABC had "negated Plaintiff's claims by providing sufficient evidence to establish both that it did not have access to Plaintiff's original 1977 script and that the script for <u>Lost</u> was created independently."

The court entered judgment on December 19, 2011. Spinner filed a timely notice of appeal.

## STANDARD OF REVIEW

A defendant may move for summary judgment when it contends that an action has no merit. (Code Civ. Proc., § 437c, subd. (a).) The defendant has met its burden of showing that a cause of action has no merit if it has shown that one or more elements of the cause of action cannot be established, or that there is a complete defense to that cause of action. (§ 437c, subd. (p)(2).) Once the defendant has met that burden, the burden shifts to the plaintiff to set forth specific facts showing a triable issue of material fact. (*Ibid*.) The court shall grant the motion for summary judgment if there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (§ 437c, subd. (c).)

"An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination or guess work.' [Citation.] Further, an issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' [citation], or mere possibilities [citation].'" (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196-197.) A genuine issue of material fact exists if, and only if, the evidence would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment. (*Mammoth Mountain Ski Area v. Graham* (2006) 135 Cal.App.4th 1367, 1371.)

11

If the moving party establishes through uncontroverted evidence that there is no triable issue of material fact, "summary judgment may not be denied on grounds of credibility or for want of cross-examination of witnesses furnishing affidavits or declarations." (Code Civ. Proc., § 437c, subd. (e).) "'In other words, the judge generally lacks discretion to deny the motion and send the case to trial simply to allow the opposing party to cross-examine the affiants or otherwise test their credibility.'" (*Trujillo v. First American Registry, Inc.* (2007) 157 Cal.App.4th 628, 636.)

We review the grant of summary judgment de novo, applying the same legal standard as the trial court in determining whether any genuine issues of material fact exist or whether the moving party is entitled to judgment as a matter of law. (*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 390.) We accept as true the facts shown by the losing party's evidence and reasonable inferences therefrom, and we resolve evidentiary doubts or ambiguities in the losing party's favor. (*Saelzer v. Advanced Group 400* (2001) 25 Cal.4th 763, 768; *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 148.)

## DISCUSSION

Generally, there is no property right in an idea. "'The general rule of law is, that the noblest of human productions -- knowledge, truths ascertained, conceptions, and ideas -- become, after voluntary communication to others, free as the air to common use.'" (*Desny v. Wilder* (1956) 46 Cal.2d 715, 731-732 (*Desny*), quoting *International News Service v. Associated Press* (1918) 248 U.S. 215, 250.) Nevertheless, the California Supreme Court held in *Desny*, *supra*, at pages 733-734, that an idea can be the subject of an express or implied contract, and its disclosure and submission can be consideration for a promise to pay compensation. Plaintiffs may therefore have a cause of action in contract for disclosing an idea to a defendant that uses that idea without compensation.

In an idea submission case such as this, to prevail on a cause of action for breach of implied-in-fact contract, plaintiffs must show (1) they clearly conditioned the submission of their ideas on an obligation to pay for any use of their ideas; (2) the defendants, knowing this condition before the plaintiffs disclosed the ideas, voluntarily accepted the submission

12

of the ideas; and (3) the defendants found the ideas valuable and *actually used* them -- that is, the defendants based their work substantially on the plaintiffs' ideas, rather than on their own ideas or ideas from other sources. (*Mann v. Columbia Pictures, Inc.* (1982) 128 Cal.App.3d 628, 646-647 & fn. 6 (*Mann*).)

The summary judgment motion in this case, and thus this appeal, focuses solely on the use element. When plaintiffs do not have direct evidence of use, they may raise an inference of use by showing the defendants had access to their ideas and the defendants' work is substantially similar to the plaintiffs' ideas. (*Hollywood Screentest of America, Inc. v. NBC Universal, Inc.* (2007) 151 Cal.App.4th 631, 646 (*Hollywood Screentest*); *Teich v. General Mills, Inc.* (1959) 170 Cal.App.2d 791, 797 (*Teich*).)

Even when the plaintiffs raise an inference of use, however, the defendants may dispel that inference with evidence that conclusively demonstrates the defendants independently created their product. (*Teich*, *supra*, 170 Cal.App.2d at p. 799.) When the defendants produce evidence of independent creation that is "'clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved,'" the inference of use is dispelled as a matter of law. (*Ibid.*; see also *Hollywood Screentest*, *supra*, 151 Cal.App.4th at pp. 646, 648; *Mann*, *supra*, 128 Cal.App.3d at p. 650.) In such a case, it is appropriate to grant summary judgment on the plaintiffs' implied-in-fact contract claim on the ground that the use element has been negated by uncontroverted evidence of independent creation. (*Hollywood Screentest*, *supra*, at p. 650.)

This is all to say that an issue of fact regarding substantial similarity is not necessarily sufficient to overcome summary judgment when the defendants show as a matter of law that they independently created their product. In an idea submission case, similarities that do not result from copying are "'similarities . . . without legal significance.'" (*Teich*, *supra*, 170 Cal.App.2d at p. 804 [quoting with approval the analogous copyright principle that "'"the law imposes no prohibition upon those who[,] without copying, independently arrive at the precise combination of words or notes which have been copyrighted"'" (italics omitted)]; see also *Mann*, *supra*, 128 Cal.App.3d at p. 648 [similarities between two works were without legal significance when inference of use was rebutted with clear, positive, and

uncontradicted evidence of independent creation].)  In other words, similarity is no longer a material issue when the defendants show conclusively that they independently created their product.

Even if we assume for the sake of argument that there are substantial similarities between the 1977 Script and *LOST*, we agree with the trial court that ABC presented conclusive and uncontradicted evidence of independent creation so as to negate the use element of Spinner's cause of action.  Moreover, the independent creation defense is bolstered by the fact that Spinner's so-called evidence of access is actually speculation, conjecture, or guess work, which weakens any inference of use that ABC must dispel.

## 1.  *Spinner's Showing of Access Is Insufficient as a Matter of Law*

We begin with the issue of access.  To the extent Spinner has established any inference of use, the inference is not based on proof of access.  His proof of access is inadequate as a matter of law.

Preliminarily, we note that both parties rely on copyright infringement cases in making their access arguments.  They do so with good reason.  The framework for proving use in an idea submission claim is parallel to the framework for showing copying in a copyright claim.  The elements of a copyright infringement claim are ownership of the copyright and actual copying by the defendant.  (*Meta-Film Associates, Inc. v. MCA, Inc.* (1984) 586 F.Supp. 1346, 1354 (*Meta-Film*).)  Copying is usually proven circumstantially through evidence of access and substantial similarity.  (*Id.* at pp. 1354-1355.)  It therefore comes as no surprise that the parties, as well as the court below, have relied on analogous copyright cases.  (See 4 Nimmer on Copyright (2012) The Law of Ideas, § 19D.07[B], p. 19D-89 (Rel. 84-5/2011 Pub.465) [noting that idea submission law "borrows liberally" from copyright jurisprudence and relying on copyright jurisprudence in discussing access in "law of ideas"].)  We likewise look to analogous copyright cases for guidance, in addition to idea submission cases.

Access means that the defendants had an opportunity to view or to copy the plaintiffs' work.  (*Meta-Film*, *supra*, 586 F.Supp. at p. 1355.)  More than a "'bare possibility'" of access is required, however.  (*Ibid.*; see also *Mann, supra*, 128 Cal.App.3d at

14

p. 651.)  When there is no direct evidence of access, the defendants must have had a "'reasonable possibility'" to view the plaintiffs' work, which must be based on more than mere speculation.  (*Meta-Film*, *supra*, at p. 1355; see also *Mann*, *supra*, at p. 651.)

Bare "'corporate receipt'" of the plaintiffs' work may not be sufficient to show access.  (*Meta-Film*, *supra*, 586 F.Supp. at pp. 1357-1358.)  A reasonable possibility of access requires a sufficiently strong nexus between the intermediary to whom the plaintiffs submitted their work and the creator of the allegedly offending work.  (*Id.* at p. 1357; *Merrill v. Paramount Pictures Corp.* (C.D.Cal., Dec. 19, 2005, No. CV 05-1150 SVW) 2005 WL 3955653 (*Merrill*).)  The relationship linking the intermediary and the creator should be more than the simple fact that they share a common employer.  (*Meta-Film*, *supra*, at p. 1357.)  For instance, the nexus may be sufficiently strong when the intermediary was in a position to transmit the plaintiffs' work to the creator, was a supervisor with responsibility for the creator's work, was part of the same work unit, was a contributor of creative ideas or material to the creator's work, or was otherwise in contact with the creator regarding some subject matter that overlapped with the plaintiffs' work.  (*Id.* at pp. 1355-1356, 1358.)  In other words, the intermediary and the alleged copier occupy positions such that it is natural for one to impart information to the other.  (*Id.* at p. 1356.)

Here, Spinner's evidence is insufficient as a matter of law because he relies on a bare possibility of theoretical access premised on mere speculation.  His theory of access is that the ABC drama development executives who were involved in the creation of *LOST* -- Braun, Kadin, and Sherman -- had a reasonable opportunity to view the 1977 Script because ABC had a policy of permanently retaining unreturned scripts, and the script must have been present somewhere in a "script library" at ABC.  This is guess work.  First, despite the 1972 retention policy Spinner cites, ABC never found the 1977 Script in its drama development files.[2]  This is perhaps unsurprising, given the passage of time between

---

[2] While ABC found the Outer Space Treatment in its files, Spinner appears to have abandoned any claim based on the treatment.  He has admitted that *LOST* and the Outer Space Treatment are not substantially similar.  The essential element of use is not present if ABC did not base *LOST* substantially on the ideas in the treatment.  (*Mann, supra*, 128 Cal.App.3d at p. 647, fn. 6.)

15

Spinner's 1977 submission on the one hand and the creation of *LOST* and this lawsuit on the other. Second, Spinner refers repeatedly to a so-called script library at ABC, but there is no evidence that there was a centralized library of sorts the executives could access and search. (Compare *Robinson v. New Line Cinema Corp.* (4th Cir., Apr. 14, 2000, No. 99-2167) 2000 WL 380124 [access inferred based on, among other things, direct evidence that script was logged into "computerized 'script library'" and executive involved in creating infringing work had access to library] (*Robinson*).) The existence of a script library is supposition based on ABC's 1972 policy that it will permanently retain unreturned scripts.

Third, the nexus between the people to whom Spinner submitted his work and the actual creators of *LOST* does not remotely approach strong. The purported nexus involves several potential intermediaries and several areas of speculation. Spinner submitted the 1977 Script to ABC executives Alsberg and Gross. They both left ABC in the 1970's. Leoni, the executive to whom Spinner verbally repitched his idea in the early 1990's, left ABC in 1995. Braun, who conceived of the general concept for *LOST*, first started working for ABC in 1999. Although these individuals shared ABC as an employer and drama development as a work unit, they were not employed at the same time, and in the case of Alsberg and Gross, the people who actually received the 1977 Script, their employment at ABC ended decades before Braun's employment and the creation of *LOST*. Thus, Alsberg, Gross, and Leoni were in no position to transmit Spinner's work to Braun and the other creators -- Lieber, Abrams, and Lindelof. Indeed, none of these creators state they have ever spoken with or received any materials from Alsberg, Gross, or Leoni. There is therefore no evidence that Alsberg, Gross, and Leoni had contact with the creators such that they could contribute ideas to *LOST*. And they certainly did not have supervisory responsibility over the creators of *LOST*. These potential intermediaries simply did not occupy positions such that it would be natural for them to impart information to the *LOST* creators. (*Meta-Film*, *supra*, 586 F.Supp. at p. 1356.)

To the extent Spinner is suggesting that Kadin and Sherman are potential intermediaries because these executives had supervisory responsibility over *LOST*, sat in on the initial meeting between Lindelof and Abrams, and reviewed Lindelof's and Abrams's

16

work, there is also no evidence that these executives had any contact with the original intermediaries who actually received Spinner's work. Any theory of transmission is, again, speculation. Spinner's theory of access always comes back to the bare possibility that Kadin, Sherman, or Braun had access to the 1977 Script through an imagined script library, and they then conveyed his ideas to Lieber, Abrams, and Lindelof. This theory is simply not supported by any evidence. (*Mann, supra*, 128 Cal.App.3d at p. 650 ["'mere possibilities' do not afford the basis for factual inferences"].)

This is made all the more apparent when we compare this case to the case on which Spinner relies for his script library theory, *Robinson*. In *Robinson*, the court held that there was a genuine issue of material fact as to "reasonable possibility of access" for several reasons. (*Robinson*, *supra*, 2000 WL 380124.) The intermediary who received the plaintiff's work and the executive responsible for the allegedly infringing product worked for the same company at the same time and were only two floors apart. (*Ibid.*) Both of them attended the same weekly meeting for executives. (*Ibid.*) And it was undisputed that the intermediary received the plaintiff's script and had the details of the script's submission logged into their employer's "computerized 'script library,'" which was accessible to the other executive. (*Ibid.*) *Robinson* is distinguishable not only because the evidence suggested the intermediary and the creator could have crossed paths and traded information, but also because direct evidence showed that a script library existed and the plaintiff's script was entered into it. We have no comparable evidence here.

Besides his main theory regarding the script library, Spinner also argues that access can be inferred from "the record-breaking speed" of *LOST*'s creation. He asserts that the four days Lindelof and Abrams took to draft the initial outline and the overnight decision to produce the pilot based on the outline alone was unprecedented. Even if we assume that this was unprecedented timing for creating a 21-page outline and making a decision, these facts alone do not give rise to a reasonable inference of access. The evidence shows that ABC was, indeed, trying to move with speed because it hoped to produce *LOST* for the 2004 to 2005 television season, and the creators were already behind if this was the case. Moreover, the single case that Spinner cites for this argument is distinguishable in that the inference of

17

access arose not from the short creative time frame alone; other facts showed the plaintiff's work was widely disseminated and the alleged infringers had the opportunity to view that work. (*JB Oxford & Co. v. First Tennessee Bank National Assn.* (M.D.Tenn. 2006) 427 F.Supp.2d 784, 796.)

In sum, Spinner has shown only a bare possibility of access based on speculation, supposition, and guess work. He has not shown a reasonable possibility of access as a matter of law. (See *Meta-Film*, *supra*, 586 F.Supp. at pp. 1357-1358 [evidence of access insufficient as a matter of law when only connection between intermediary and studio that created allegedly infringing work was that intermediary was under contract with studio regarding other projects and had an office on studio lot].) Any inference of use, therefore, would have to be based on substantial similarity alone.

## 2.   ABC's Evidence of Independent Creation Is Uncontroverted and Dispels Any Inference of Use as a Matter of Law

Assuming for the purposes of argument that substantial similarity between the 1977 Script and *LOST* gives rise to an inference of use, ABC has proffered uncontradicted evidence that it independently created *LOST*.

We begin with the two published California decisions discussing independent creation at length. *Teich, supra*, 170 Cal.App.2d at pages 799-804, set forth the independent creation defense to an idea submission lawsuit. (See also *id.* at p. 803 ["[D]oes proof that there was no copying of plaintiff's product make a complete defense, although the thing actually used by defendant was closely similar to the one which plaintiff had presented to it? The authorities require an affirmative answer."].) In that case, Teich developed an idea for a gadget that made "sun pictures," consisting of a black opaque envelope containing a collapsed cardboard holder, a "negative," which was a picture printed on cellophane, and two pieces of sensitized paper. (*Id.* at p. 795.) The gadget printed the negative picture on the sensitized paper upon exposure to the sun. (*Ibid.*) Teich submitted this idea to General Mills with the thought that it could be used as a cereal box prize. (*Id.* at pp. 795-796.) On July 20, 1955, Teich met with an advertising and sales promotion manager of a division of General Mills in his San Francisco office. The manager expressed approval of the gadget

18

and asked Teich to work on some improvements. (*Ibid.*) Teich left some samples with the manager. (170 Cal.App.2d at p. 796.) He made several attempts to contact the manager after that meeting, but he was unsuccessful. (*Id.* at p. 797.) In January 1956, Teich saw that General Mills was offering in one of its cereals a "'Magic Sun Picture,'" which bore a "marked similarity" to his gadget. (*Ibid.*) "The basic principle was the same but there were differences in details," though the differences were "insignificant." (*Id.* at pp. 797, 801.)

Teich brought an idea submission case against General Mills based on the contract action recognized in *Desny*. (*Teich, supra*, 170 Cal.App.2d at p. 794.) The jury found for Teich, but the trial court granted General Mills' motion for judgment notwithstanding the verdict. (*Ibid.*) The court of appeal affirmed. (*Id.* at p. 806.) The court explained that Teich's showing of access -- that he had submitted his idea to the General Mills manager -- and the marked similarity between Teich's idea and the General Mills Magic Sun Picture raised an inference of copying and use by General Mills. (*Id.* at pp. 797-799.) Nonetheless, General Mills dispelled this inference as a matter of law with conclusive and uncontradicted evidence that the Magic Sun Picture was independently conceived. (*Id.* at pp. 799-800.) The evidence consisted of testimony from three witnesses that an advertising agency had conceived of the idea and had contacted General Mills at its Minneapolis office (without disclosing any details of the product) several weeks before Teich first contacted the manager in San Francisco. (170 Cal.App.2d at p. 799.) Two of these witnesses were General Mills employees, and the third was the developer of the product at the advertising agency. (*Ibid.*) The testimony of these witnesses was supported by documentary evidence of correspondence showing that, while the advertising agency eventually disclosed the details of its product in Minneapolis nine days after Teich's meeting with the manger in San Francisco, the agency had been developing its product well before Teich first contacted General Mills. (*Id.* at pp. 800-802.) The court held that General Mills' evidence conclusively proved independent creation of the Magic Sun Picture without knowledge of Teich's idea. (*Id.* at p. 802.) It followed from the absence of copying that Teich had no cause of action. (*Id.* at p. 805.)

19

In *Hollywood Screentest*, *supra*, 151 Cal.App.4th at pages 646-648, the court followed *Teich* and applied the independent creation defense to bar the plaintiffs' idea submission claim. The president of Hollywood Screentest of America, Inc., James Pascucci, conceived of an idea for a reality show called *Hollywood Screentest* that "would give ordinary people from all walks of life the chance to break into the close-knit Hollywood entertainment community." (*Id.* at p. 633.) Pascucci contacted an executive at NBC about his idea in January 2001. They corresponded back and forth about his idea until November 2001, when an NBC executive told Pascucci that NBC was "'not looking for this type of program right now.'" (*Id.* at pp. 634-635.) Pascucci continued to contact NBC with almost no response until September 2002, when NBC told him it was still going to pass on the idea. (*Id.* at p. 635.) On September 5, 2002, NBC issued a press release announcing a new reality show called *Next Action Star*. (*Id.* at p. 636.) Pascucci observed a number of similar elements between *Next Action Star* and *Hollywood Screentest*, such as having an acting coach on set to assist the contestants with their challenges, using celebrities in various challenges, a movie deal as the grand prize, using the Internet and the television show itself to promote the film component of the show. (*Ibid.*) Pascucci brought an idea submission case against NBC including a claim for breach of implied-in-fact contract. (*Id.* at p. 638.) NBC moved for summary judgment on the ground that *Next Action Star* was independently created. (*Ibid.*) The trial court granted the summary judgment motion. (151 Cal.App.4th at p. 641.)

The court of appeal affirmed, holding that NBC had presented undisputed evidence that *Next Action Star* was created by entities unrelated to NBC and unassisted by NBC, and Pascucci had not presented any evidence calling into question the evidence supporting independent creation. (*Hollywood Screentest*, *supra*, 151 Cal.App.4th at pp. 647-648.) The evidence of independent creation consisted of declarations from individuals at the three different companies involved in the development of *Next Action Star* and the testimony of three NBC employees. The declarations documented the creation process that occurred over the course of a year before the creators presented the idea to NBC. (*Id.* at pp. 636-637, 647, fn. 8.)

20

In affirming the judgment, the court explained that Pascucci had "point[ed] to no evidence that NBC actually used" his ideas. (*Hollywood Screentest*, *supra*, 151 Cal.App.4th at p. 648.) Rather, he asked the court to "draw inferences based on general similarities and timing," and he argued that a fact question existed as to whether *Next Action Star* was independently created because of the "numerous similarities" between the shows, the modification of *Next Action Star* from its original stuntman concept to the actor concept provided by Pascucci, and NBC's simultaneous acceptance of *Next Action Star* and rejection of *Hollywood Screentest*. (*Ibid.*) The court concluded that Pascucci's "speculation as to NBC's use is insufficient to create a disputed issue of fact. An inference of use sufficient to challenge NBC's 'clear, positive and uncontradicted evidence' of independent creation may not be drawn from ""suspicion alone, or . . . imagination, speculation, supposition, surmise, conjecture, or guesswork."""" (*Ibid.*) Therefore, the similarities and timing were insufficient to create a disputed issue of fact. (*Ibid.*) Ultimately, the uncontradicted evidence of independent creation negated the use element of the cause of action. (*Id.* at p. 650.)

In the case at bar, the evidence of independent creation is clear, positive, and uncontradicted, as it was in *Teich* and *Hollywood Screentest*. Because this evidence dispels any inference that ABC used Spinner's ideas as a matter of law, the trial court did not err in granting summary judgment.

The evidence of independent creation may be summarized as follows. ABC executive Braun conceived of the general concept for *LOST* around January 2003 when he thought of melding *Survivor* and Cast Away to do a show about survivors of a crash landing on a deserted island. He pitched this idea to other executives at a brainstorming session during a company retreat, at which he also compared the concept to *Gilligan's Island* and *Lord of the Flies*. ABC transcribed this brainstorming session and included the transcription of Braun's pitch in the record. Lieber was assigned the work of drafting the script based on Braun's idea in September 2003. His work included the early seeds of what became *LOST*, including a cast of plane crash survivors stranded on a seemingly deserted tropical island, competition for leadership roles among the survivors, the use of the plane fuselage as a

21

setting, and mystery regarding the main characters' backgrounds.  The outline also included characters whose basic characteristics are familiar from some of the *LOST* characters -- a pregnant woman, a calm and collected older man, a doctor, a drug addict, a military officer, and a spoiled rich girl.  Several outline drafts and several drafts of Lieber's pilot script are all part of the record.

After Braun rejected Lieber's attempts to draft a script, Abrams and Lindelof took up the project in early January 2004.  Their initial meeting yielded many ideas and six pages of notes containing many of the main characters and concepts that eventually became the *LOST* pilot.  Lindelof and Abrams thereafter began drafting an outline to submit to ABC, and the various drafts of this outline are documented in the record through Lindelof's contemporaneous emails, which attach these drafts, to Abrams and the *Alias* writers and producer.  Similarly, after ABC picked up the pilot based on the outline, the drafts of character sides for auditions, drafts of each act, and drafts of the complete pilot script are in the record, and, for the most part, they are attached to Lindelof's contemporaneous emails as he distributed the drafts to Abrams and the rest of the group.  Thus, documented in the record is the evolution of the *LOST* pilot from six pages of notes to a 90-plus-page script, over the course of approximately three months (from January 13, 2004, to April 19, 2004).  This is supported by the declarations of Abrams and Lindelof and voluminous exhibits thereto.

Moreover, the key players involved in creating *LOST* -- Abrams, Lindelof, Lieber, and Braun -- have declared that (1) they knew nothing of Spinner, his 1977 Script, or his Outer Space Treatment until this lawsuit; (2) they did not have his script or treatment while working on *LOST*; and (3) no one ever mentioned his script or treatment to them.  The key players additionally declared that they had never had any contact with the ABC or SMK executives who received Spinner's 1977 Script or Outer Space Treatment, with the exception of Shephard.  As to Shephard, the key players had never spoken with her about Spinner's work or received any materials from her regarding his work.  In fact, each of the ABC executives who received Spinner's work left ABC long before *LOST* was created -- Gross in 1977, Alsberg in 1979, Leoni in 1995, and Shephard in 1997.  Finally, Spinner

22

himself stated unequivocally that he never contacted those involved in the production and creation of *LOST* and never transmitted any materials to them.

As we noted previously, this evidence of creation independent of Spinner's work is clear, positive, uncontradicted, and of such a nature that it cannot rationally be disbelieved. (*Teich*, *supra*, 170 Cal.App.2d at p. 799.) The evidence is of the same type that was relied on in *Teich* and *Hollywood Screentest* – sworn statements of the creators and contemporaneous correspondence documenting the creation process. (*Teich*, *supra*, at pp. 799-802; *Hollywood Screentest*, *supra*, 151 Cal.App.4th at pp. 636-637, 647, fn. 8.) Spinner has not presented any evidence that *LOST* was not created in the manner described in detail by the declarations and supporting exhibits of Braun, Lieber, Lindelof, and Abrams. Instead, he argues that evidence of access and substantial similarities contradicts the evidence of independent creation. First, this reasoning is circular and unpersuasive. Evidence of access and substantial similarities may indeed raise an inference of use, but this inference may be dispelled as a matter of law with the very type of evidence ABC presents. (*Teich, supra*, at p. 799.) That is, even if evidence of access and substantial similarity exists, it does not contradict ABC's evidence per se, but merely gives rise to an opposing inference, which ABC has dispelled. Second, Spinner's "evidence of access" is nothing more than speculation, conjecture, imagination, or guess work, as we have observed in part 1 of the Discussion. Speculation that Braun, Kadin, or Sherman had access to the 1977 Script, and then more speculation that they transmitted Spinner's ideas to Lieber, Lindelof, or Abrams, is insufficient sufficient to create an issue of fact. (*Sinai Memorial Chapel v. Dudler*, *supra*, 231 Cal.App.3d at pp. 196-197; see also *Hollywood Screentest*, *supra*, at p. 648 [inference of use sufficient to challenge the defendant's clear, positive, and uncontradicted evidence of independent creation may not be drawn from suspicion, imagination, speculation, supposition, conjecture, or guess work alone].)

Spinner makes other arguments not based on allegedly conflicting evidence. For instance, he argues about the quality or competency of ABC's evidence. He maintains that the "self-serving declarations" of interested witnesses -- Braun, Lieber, Abrams, and Lindelof -- cannot establish independent creation as a matter of law. This argument fails to

persuade. As the creators of *LOST*, it would be odd indeed if these individuals were not key witnesses in this lawsuit. Lieber, Abrams, and Lindelof were not in-house ABC employees, but were third parties ABC engaged to write *LOST*. They are akin to the advertising agency witness in *Teich*, who developed the allegedly copied gadget, and the individuals at the non-NBC companies in *Hollywood Screentest*, who developed the idea for *Next Action Star* and took it to NBC. All of these witnesses were presumably "interested" as well, but the courts nevertheless relied on those witnesses in finding independent creation as a matter of law. Moreover, as we have already observed, the evidence of independent creation was not just these witnesses' statements alone. The documentary evidence and particularly the contemporaneous emails showing the evolution of *LOST* by Lindelof and Abrams supports our conclusion.

To the extent Spinner is suggesting that these witnesses are not credible and therefore their testimony cannot support summary judgment, we disagree. Their statements that they did not have access to the 1977 Script and did not know of Spinner's work until this lawsuit are not contradicted. And, their accounts of how *LOST* was created are not contradicted. We may not deny summary judgment on grounds of credibility when ABC has established the independent creation defense thusly. (Code Civ. Proc., § 437c, subd. (e).)

In another instance, Spinner suggests that ABC's evidence is not as good as the evidence in *Teich* and *Hollywood Screentest* because in those cases, the offending works were developed without involvement from the defendants and were brought to the defendants after the fact. Here, he asserts, ABC was involved in the creation of *LOST* from day one -- ABC executive Braun conceived of the concept and was involved throughout with the third-party creators. And by this time, Spinner argues his script had been sitting in ABC's purported "library" for decades. We do not find these differences to mean that we cannot rely on *Teich* and *Hollywood Screentest*. In those cases, the evidence simply suggested that the third-party creators did not have access to the plaintiff's work during their creative process. We have already discussed how Spinner has not shown access as a matter of law. We will not reiterate that discussion here.

24

In sum, the evidence that ABC independently created *LOST* is clear, positive, and uncontradicted.  This is sufficient to hold that ABC established the independent creation defense as a matter of law.  The trial court therefore did not err in granting summary judgment.

## DISPOSITION

The judgment is affirmed.  Respondent to recover costs on appeal.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.