Filed 11/6/15  Terenzio v. Current TV, LLC CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| JOHN TERENZIO et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>CURRENT TV, LLC et al.,<br><br>        Defendants and Respondents. | A142617<br><br>(San Francisco County<br>  Super. Ct. No. CGC-13-529261) |

This is an appeal from judgment following the trial court's order granting summary judgment to defendants Current TV, LLC and Current Media LLC (collectively, Current).  Plaintiff John Terenzio and TAP, Inc. (collectively, plaintiffs) sued Current for breach of implied contract and quantum meruit after Current failed to pay Terenzio compensation for its purported use of a business idea he presented to one of Current's corporate directors and minority investors relating to the potential for the acquisition of Current by the Al Jazeera television network in July 23, 2012.  This acquisition in fact occurred in January 2013.  However, the trial court found there was no implied contract between the parties, or any other legal basis for requiring Current to compensate Terenzio for use of his business idea.  On appeal, plaintiffs challenge the trial court's summary judgment ruling, as well as the court's initial decision to hear the summary judgment motion without first ruling on plaintiffs' motion to compel.  We affirm the judgment in its entirety for reasons stated below.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Current TV, LLC, and its wholly-owned subsidiary, defendant Current Media LLC, were Delaware limited liability companies that operated the Current cable television network. This network had cable placements in approximately 60 million U.S. households until its sale in January 2013 to Qatar-based news organization and media conglomerate, Al Jazeera Media Network (Al Jazeera). Current was founded in 2002 by former Vice President Albert Gore and entrepreneur Joel Hyatt. Gore served as Current's chairman of the Board, while Hyatt served as Current's Chief Executive Officer and Board member, until the company's sale.[1]

Terenzio, in turn, is an accomplished television producer and owner/sole shareholder of plaintiff TAP, Inc., a Florida corporation. During a trip to the Middle East in 2011, Terenzio became interested in Al Jazeera after watching its English language channel, Al Jazeera English. Terenzio learned that Al Jazeera English had won awards in the United States for quality journalism. The channel, however, had not been able to penetrate the U.S. cable market despite having a keen interest in doing so. Terenzio, who had previous international media experience advising a U.S. television network regarding the Chinese National Broadcast Network, developed a presentation concerning Al Jazeera English. This presentation addressed how Al Jazeera could obtain cable placement in a significant number of U.S. households "on a market-by-market basis" and, at the same time, moderate any negative reactions to the Al Jazeera brand arising from its Middle Eastern origin.

In 2011 or 2012, Terenzio presented his Al Jazeera research and ideas to a friend, Richard Nanula of Colony Capital, with the hope that Colony Capital might invest in the project. The project did not go forward at that time. However, Nanula later heard that Richard Blum, a director on Current's Board and minority shareholder through his company, Blum Capital, had indicated Current was losing money and thought Current

---

[1] Gore was initially named as an individual defendant in the lawsuit before ultimately being dismissed.

should be sold.  Nanula, believing Al Jazeera could be a good fit for Current, approached Blum in July 2012 to recommend that he talk to Terenzio about his ideas regarding Al Jazeera.  Blum expressed interest to Nanula, and told him to have Terenzio contact him directly.

On July 18, 2012, Terenzio emailed Blum to inquire about setting up a meeting to discuss "some thoughts which may be helpful regarding your media investments." Terenzio further explained: "I'm coming to San Francisco on Monday to spend much of the day with your stepdaughter, Katherine, and if you're free in the afternoon, I can drop by and visit."  Terenzio had reshaped his original Power Point presentation to focus directly on how Al Jazeera could penetrate the U.S. cable market through Current's existing cable distribution agreements rather than on a market-by-market basis.  Blum agreed to hear his ideas, and had his associate ask whether Terenzio could arrange to meet at Blum's Berkeley office.  Terenzio agreed.  Accordingly, on Monday, July 23, 2012, Terenzio travelled from his home in the Los Angeles area to the Bay Area, where he attended a morning and lunch meeting in San Francisco, before travelling on to Berkeley, where he spent roughly one to two hours with Blum talking generally and giving his Power Point presentation, "ALZ America: The Path to U.S. Distribution."  The Power Point presentation addressed, among other things, the potential value to Al Jazeera and Current of using Current's distribution as a base to place Al Jazeera English in roughly 60 million U.S. households.  The presentation also covered post-sale steps Current could take to temper any negative reaction to the relationship by engaging with and gaining tacit approval from both policy makers and opposition groups (including Israel and U.S. Jewish groups).[2]  When their meeting concluded, Terenzio gave Blum a copy of his Power Point.  Blum told Terenzio he would discuss his ideas with Gore, Current's founder, shareholder and Chairman.

---

[2]  In San Francisco, Terenzio met with Blum's stepdaughter, Presiding Judge of the Superior Court, to discuss the possibility of working with her in a courtroom-based reality television show.

Blum did in fact subsequently have a 15-to-20 minute telephone conversation with Gore about what he had learned from Terenzio's presentation, although he did not identify Terenzio by name, nor share with him the Power Point presentation. Gore, however, rejected the idea out of hand, noting the potential political ramifications of selling Current to Al Jazeera. Gore later mentioned to Hyatt that a friend of Blum's had suggested selling Current to Al Jazeera. Like Gore, Hyatt did not entertain the idea at that time. According to Hyatt, he and Gore were already familiar with the idea that Al Jazeera could be a potential qualified buyer of Current. In fact, Al Jazeera had approached Current in 2011 about a possible partnership, which Hyatt understood at the time to be an effort by Al Jazeera to gain access to Current's distribution network in the United States. Current, however, was not interested at that time either.

In the late summer of 2012, Hyatt and Gore definitively decided to sell Current. To this end, in mid-September 2012, Current began working with investment bankers, including Jeffrey Sine from The Raine Group, LLC (Raine), to find a strategic buyer or investor for the company.[3] On September 25, 2012, following several conversations (in person and otherwise), Sine directed a colleague to send Hyatt a list of about 100 recommended potential buyers for Current, one of which was Al Jazeera. A conference call with Current, Raine and J.P. Morgan representatives was then held a few days later to discuss the potential buyer list. During this call, Hyatt rejected the idea of Al Jazeera as Current's buyer.

Nonetheless, the record reflects that, throughout this time period, Gore and Hyatt thought further about the possibility of selling Current to Al Jazeera. For example, in an email dated September 18, 2012, Hyatt noted to Gore that Al Jazeera had a reputation for quality journalism and was interested in successfully penetrating the U.S. market. Hyatt also noted the possibility that Al Jazeera's interest in penetrating the U.S. market could be parlayed into a premium sale price – "as much as a billion dollars" – for Current. Hyatt opined that involving the influential Brookings Institute in the sale might head off

_____

[3]     Current had earlier retained J.P. Morgan to assist with finding a buyer for the company, but none had been found.

4

any negative public reaction to the sale. In another series of emails on September 27, 2012, the same day as their conference call with Raine and J.P. Morgan representatives, Hyatt and Gore agreed that, if they were to sell Current to Al Jazeera, they should "just do so," without relying on a "convoluted structure" involving the Brookings Institute. Also on September 27, Hyatt emailed Sine requesting they talk the following day about "Al Jazeera" and, in particular, "some research" he and Gore had done.

Hyatt explained by declaration and in deposition testimony that, although he and Gore initially rejected the idea of selling Current to Al Jazeera, the men began to rethink their position in light of Sine's ongoing promotion of the idea. Sine, an investment banker since 1986, had vast experience with the media business and was well-aware Al Jazeera had a keen interest in obtaining a U.S. platform for cable distribution, through Current or another partner. Indeed, Sine's persistence prompted Hyatt to undertake his own research into Al Jazeera.[4] As a result of Hyatt's substantial research, which included discussions with policy makers and Middle East experts, Hyatt, and eventually Gore, decided Al Jazeera was in fact the best fit for Current. However, the decision was made to disclose Current's interest in Al Jazeera to only a select few individuals at Raine and Current, explaining Hyatt's pretend expression of disinterest in Al Jazeera during the September 27 conference call with a large group from J.P. Morgan and Raine.

Accordingly, on September 29, 2012, Hyatt instructed Sine to approach Al Jazeera confidentially regarding a sale of Current. Following confidential negotiations and extensive due diligence, including travel to Qatar, a deal was reached and, on January 2, 2013, news of the sale of Current to Al Jazeera went public.

Given the extreme confidential nature of these negotiations, Current's board members, including Blum, were not advised of the deal until it was consummated. Blum, who was quite surprised to learn of the deal, called Nanula. Both Blum and Nanula believed Terenzio's ideas had played a role in the sale, and that he was entitled to compensation by Current. Blum made clear to Nanula, however, that he was expressing

---

[4]    Hyatt was not sure exactly when Sine began to push the idea of Al Jazeera as purchaser.

his personal view, not that of Current. The men discussed what would be an appropriate fee for Terenzio, ultimately deciding the sum of 0.5 to one percent of the transaction price as a "finder's fee" would be appropriate. Blum and Nanula subsequently met with Terenzio in Los Angeles, and shared their opinions that Terenzio deserved compensation for the idea of selling Current to Al Jazeera.

The proposed compensation was never paid to Terenzio, however, and on July 10, 2013, he filed the operative complaint, the First Amended Complaint, in this lawsuit. The complaint asserts two causes of action, the first for breach of implied agreement and the second for quantum meruit. It also seeks compensatory damages based upon the alleged reasonable value of Terenzio's services to Current.

On November 27, 2013, Current filed its motion for summary judgment or, alternatively, for summary adjudication. Current argued, inter alia, that no triable issue of fact exists with respect to plaintiffs' allegations that Blum entered into an implied contract with Terenzio on behalf of Current to compensate him (as a consultant, a finder, or something else) for the idea of selling Current to Al Jazeera.

While this summary judgment motion was pending, plaintiffs filed a motion to compel production of documents and to continue the hearing to allow discovery to go forward. Current, in turn, filed a motion to stay discovery of confidential documents until resolution of the summary judgment motion. These motions were initially heard by a Judge Pro Tem, who recommended that plaintiffs' motion to compel and to continue the summary judgment hearing be granted with certain qualifications, and that Current's motion to stay be denied. On March 11, 2014, Current then filed a motion to seal certain confidential documents relevant to summary judgment.

Following a contested hearing on the pending motions held May 23, 2014, the trial court issued an order granting Current's motion for summary judgment against plaintiffs on the following grounds: (1) no triable issue of material fact indicates an implied contract had formed between the parties; rather, the undisputed facts demonstrate plaintiff merely presented the idea of Al Jazeera acquiring Current to Blum, a person who lacked actual authority to contract on behalf of Current and who Current never designated to

6

receive idea submissions on its behalf or held out as possessing such authority; (2) no triable issue of material fact indicates Terenzio acted or had been hired as a consultant, such that he would be entitled to compensation; (3) no triable issue of material fact indicates Terenzio had facilitated or had contacts on both sides of the Current-Al Jazeera transaction, such that he would be entitled to a finder's fee; and (4) no triable issue of material fact was raised regarding "the fact that the idea of Al Jazeera acquiring Current – the only idea communicated to members of Current other than Blum – was initially conveyed to . . . Blum by Richard Nanula, and without an expectation of compensation for the idea."

The trial court also granted Current's motion to seal, expressly finding that the records under seal "implicate overriding interests, including Defendants' interest in the privacy of its business, financial and proprietary information; Defendants' interest in avoiding the consequences of breaching nondisclosure obligations; and the interest of third parties in the confidentiality of their financial and personal information." Finally, the court orally denied plaintiffs' motion to continue the summary judgment proceedings.

Judgment in favor of Current was thus entered, following by the filing of plaintiffs' timely notice of appeal.

## DISCUSSION

Plaintiffs raise the following arguments on appeal, which we address in turn. First, plaintiffs contend the trial court erred in granting Current's summary judgment motion because triable issues of fact exist with respect to whether: (a) there was an implied contract between Current and plaintiffs; (b) Blum had authority to enter into this implied contract on behalf of Current; (c) Current ratified, or should be estopped from challenging, Blum's acceptance of the implied contract; and (d) Current used Terenzio's idea. Second, plaintiffs contend the trial court erred by failing to address their quantum meruit cause of action before granting summary judgment. Third, plaintiffs contend the trial court "erred in granting summary judgment without first ruling on [their] motion to

7

compel" and refusing to continue the summary judgment hearing to enable appropriate discovery.[5]

The rules governing our review of plaintiffs' contentions are well-established. A defendant moving for summary judgment has the burden of showing that a cause of action has no merit by demonstrating one or more elements of the cause of action cannot be established or that a complete defense to that cause of action exists. (Code of Civ. Proc., § 437c, subd. (p)(2).) If the defendant successfully meets this burden, the plaintiff then has the burden of setting forth specific facts showing the existence of one or more triable issues of material fact. (*Ibid.*) The trial court may grant the defendant's summary judgment motion if there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (§ 437c, subd. (c).)

" 'An issue of fact can only be created by a conflict of evidence. It is not created by "speculation, conjecture, imagination or guess work." [Citation.] Further, an issue of fact is not raised by "cryptic, broadly phrased, and conclusory assertions" [citation], or mere possibilities [citation]." ' [Citation.] A genuine issue of material fact exists if, and only if, the evidence would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment. [Citation.]" (*Spinner v. American Broadcast Companies, Inc.* (2013) 215 Cal.App.4th 172, 183 (*Spinner*).)

On appeal, this court reviews the grant of summary judgment de novo. In doing so, we apply the same legal standards as the trial court to determine whether there exists any genuine issue of material fact or whether the moving party is entitled to judgment as a matter of law. (*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 385, 390.) Further, we must accept as true all facts demonstrated by the losing party's evidence, as well as reasonable inferences drawn from those facts and evidence, while resolving all evidentiary doubts and ambiguities in the

---

[5]    In briefing, plaintiffs also contended the trial court abused its discretion in granting Current's motion to seal without the requisite legal showing. However, this issue has since been resolved. Pursuant to the agreement of both counsel at oral argument, we ordered the record in this case to be unsealed by the clerk of this court, and the unredacted briefs of the parties to be filed in the public record.

8

losing party's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768; see also *Hulett v. Farmers Ins. Exchange* (1992) 10 Cal.App.4th 1051, 1060 ["The presence of inferences supporting a judgment in favor of plaintiff is sufficient to defeat a summary judgment order in favor of defendant"].)

## I. Are There Triable Issues of Material Fact As To The Existence Of An Implied Contract Between Plaintiffs And Current?

The primary dispute for purposes of this appeal is whether Current impliedly agreed to compensate Terenzio for use of his business idea of selling Current to Al Jazeera to enable Al Jazeera to penetrate the United States cable market. The legal parameters of plaintiffs' implied agreement theory were recently set forth by our colleagues in the Second Appellate District, Division Eight, and we repeat them here. "Generally, there is no property right in an idea. ' "The general rule of law is, that the noblest of human productions—knowledge, truths ascertained, conceptions, and ideas — become, after voluntary communication to others, free as the air to common use." ' (*Desny v. Wilder* (1956) 46 Cal.2d 715, 731-732 [299 P.2d 257] (*Desny*), quoting *Internat'l News Serv. v. Assoc. Press* (1918) 248 U.S. 215, 250 [63 L.Ed. 211, 39 S.Ct. 68.) Nevertheless, the California Supreme Court held in *Desny, supra,* at pages 733-734, that an idea can be the subject of an express or implied contract, and its disclosure and submission can be consideration for a promise to pay compensation. Plaintiffs may therefore have a cause of action in contract for disclosing an idea to a defendant that uses that idea without compensation." (*Spinner, supra,* 215 Cal.App.4th at p. 184. See also Civ. Code, § 1621 ["An implied contract is one, the existence and terms of which are manifested by conduct"].)

"In an idea submission case such as this, to prevail on a cause of action for breach of implied-in-fact contract, the plaintiffs must show: (1) they clearly conditioned the submission of their ideas on an obligation to pay for any use of their ideas; (2) the defendants, knowing this condition before the plaintiffs disclosed the ideas, voluntarily accepted the submission of the ideas; and (3) the defendants found the ideas valuable and

9

*actually used* them — that is, the defendants based their work substantially on the plaintiffs' ideas, rather than on their own ideas or ideas from other sources." (*Spinner, supra,* 215 Cal.App.4th at p. 184, citing *Mann v. Columbia Pictures, Inc.* (1982) 128 Cal.App.3d 628, 646-647 & fn. 6 (*Mann*). Accord *Faris v. Enberg* (1979) 97 Cal.App.3d 309, 318 ["for an implied-in-fact contract one must show: that he or she prepared the work; that he or she disclosed the work to the offeree for sale; under all circumstances attending disclosure it can be concluded that the offeree voluntarily accepted the disclosure knowing the conditions on which it was tendered (i.e., the offeree must have the opportunity to reject the attempted disclosure if the conditions were unacceptable); and the reasonable value of the work"].)

According to plaintiffs, there are triable issues of fact, which the trial court failed to recognize, regarding the existence of an implied contract between Current and Terenzio based upon the words and conduct of Current's agent, Richard Blum. Plaintiffs reason that "Terenzio was invited to and did pitch . . . business ideas to Richard Blum, who was an owner and Director of Current, vested with managerial authority. The meeting with Blum occurred because Terenzio had business ideas that could have fit Current's business need. The meeting was commercial; there was no evidence that a gift of the ideas was intended. The meeting reeked with authority to deal on Current's behalf." Based upon this reasoning, plaintiffs claim Terenzio was entitled to reasonable compensation for his submission to Blum of the business idea of an acquisition of Current by Al Jazeera (which idea Current actually used). For reasons to follow, we disagree.

### A.     No Triable Issue Exists Regarding Blum's Authority to Bind Current.

As plaintiffs' own authority emphatically states: "*The law will not imply a promise to pay for an idea from the mere facts that the idea has been conveyed, is valuable, and has been used for profit; this is true even though the conveyance has been made with the hope or expectation that some obligation will ensue.*" (*Desny, supra*, 46 Cal.2d at p. 739, italics added.) Here, as we explain below, regardless of what Terenzio privately understood or hoped for, the undisputed record is that neither Current, nor anyone

10

authorized to act on Current's behalf, took any action that could objectively be viewed as an agreement to compensate him for use of any idea expressed to Blum during their July 2012 Berkeley meeting.

First, as Current strenuously argues, there is no evidence supporting plaintiffs' claim that Blum was acting as Current's agent at the July 2012 meeting. The law of agency is well-established. "Agency is either actual or ostensible. (Civ. Code, § 2298.) An actual agency exists when one person is employed to represent another (Civ. Code, § 2299), while an ostensible agency exists when the principal causes a third person to believe another, not employed by him, is his agent. (Civ. Code, § 2300.)" (*Vallely Investments, LP v. BancAmerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 826.)

Here, while plaintiffs insist, Blum, a director on Current's Board and minority investor through his company, Blum Capital, had actual authority to bind Current (Civ. Code, § 2299), Current Media LLC's Operating Agreement states otherwise. Specifically, the Operating Agreement provides in relevant part: "No Director . . . shall have any authority to bind the Company to any third party with respect to any matter except pursuant to a resolution expressly authorizing such action, which resolution is duly adopted by the Board of Directors." Further, with respect to Blum Capital, which, as a minority investor, is considered a "Member" of Current Media LLC, the Operating Agreement provides in relevant part: "Members shall have no power to transact any business in the Company's name nor have the power to sign documents for or otherwise bind the Company."[6] Consistent with these provisions, Blum testified to his

---

[6] As Current points out, Current Media, LLC and Current Television LLC were organized under Delaware law as "manager-managed" LLCs, meaning the investors, called "Members," delegated corporate management entirely to the Board of Directors, acting as a whole (generally requiring agreement of a majority of directors). (Del. Code tit. 6, § 18-402; Cal. Corp. Code, § 17704.07.) The Operating Agreement provides: "Any power not reserved to the Members or delegated to the officers of the Company shall remain with the Board of Directors." Under Delaware law, an LLC's operating agreement controls with respect to whether, or to what extent, its members or directors have authority to legally bind the company. (Del. Code tit. 6, § 18-402; accord Cal. Corp. Code, § 17703.01, subd. (b)(1) [where limited liability company is manager-

11

understanding that, under the corporate rules, he lacked authority both as an individual, and as a Member through Blum Capital, to transact business in Current's name or to otherwise legally bind the company. Thus, even assuming plaintiffs are correct that Blum was quite influential in corporate decision-making, the undisputed fact remains that he lacked actual authority to enter into any binding contract on Current's behalf.

Plaintiffs nonetheless try to create a triable issue with respect to ostensible agency by focusing on Blum's *conduct* at the July 2012 meeting, as well as at a later meeting, during which Blum expressed his personal opinion that Terenzio deserved compensation from Current, and during which he did not "disclaim his authority." According to plaintiffs, Blum "reeked of authority" during these instances, quoting *Donahue v. Ziv Television Programs, Inc.* (1966) 245 Cal.App.2d 593, 608 [*Donahue*].[7] However, " 'agency cannot be created by the conduct of the agent alone; rather, *conduct by the principal* is essential to create the agency. Agency "can be established either by agreement between the agent and the principal, that is, a true agency [citation], or it can be founded on ostensible authority, that is, some intentional conduct or neglect on the part of the alleged principal creating a belief in the minds of third persons that an agency exists, and a reasonable reliance thereon by such third persons." [Citation]; see Civ. Code, §§ 2298, 2300.) ' " 'The principal must in some manner indicate that the agent is to act for him [or her], and the agent must act or agree to act on his [or her] behalf and subject to his [or her] control.' . . ." [Citations.] Thus, the "formation of an agency

---

managed, "[n]o member acting solely in the capacity of a member is an agent of the limited liability company nor can any member bind or execute any instrument on behalf of the limited liability company"].)

[7] In *Donahue, supra,* 245 Cal.App.2d at p. 608, the court rejected the defense argument that the corporate vice president lacked authority to contract with plaintiff for his television show idea, and that only the president could ultimately have made the deal, where plaintiff disclosed his idea "under circumstances which reek of authority." These circumstances included the fact that a series of meetings was held between the plaintiff and representatives of the defendant corporation, the first of which was arranged by an agent, and that there were many instances during these meetings where compensation was discussed, circumstances absent in our case. (*Id.* at p. 609.)

12

relationship is a bilateral matter. Words or conduct by *both principal and agent* are necessary to create the relationship . . . ." [Citation.]' " (*Goldman v. Sunbridge Healthcare, LLC* (2013) 220 Cal.App.4th 1160, 1173 (*Goldman*), quoting *Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581, 587-588 (*Flores*).)

In this case, there is no evidence of any conduct on the part of Gore or anyone else at Current that would indicate Current authorized Blum to meet with Terenzio, much less to accept and pay compensation for his idea on Current's behalf. Nor is there any evidence Current later ratified Blum's alleged implied agreement to pay Terenzio compensation for his idea. Indeed, plaintiffs admit that Terenzio knew Blum was not "operationally in charge of the company," and that he understood that, unless Gore agreed to his idea, "it wouldn't happen." And while plaintiffs suggest otherwise, the mere fact that Blum later discussed the idea briefly with Gore (who may have then discussed it in passing with Hyatt) provide no basis to infer Current impliedly agreed to pay Terenzio for his idea. Undisputedly, neither Gore nor Hyatt ever met or spoke with Terenzio or saw his Power Point presentation, much less acted in a way that would demonstrate to Terenzio their willingness to compensate him for any idea expressed in his presentation. Given this record, we agree with the trial court there is no triable issue of fact regarding whether Blum had actual or ostensible authority to contract on Current's behalf. (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 573 ["[p]ersons dealing with an assumed agent are bound at their peril to ascertain the extent of the agent's authority"].)[8]

---

[8]     We reject plaintiffs' argument that it is "not necessary" for the formation of an implied agreement for the person receiving the idea to have had "prior authority to contract." This argument misses the point. As we have just explained, authority is derived from the conduct of the principal, not the agent and, in this case, there is simply no evidence of any conduct on the part of Current or its representatives from which to find it conferred authority on Blum, whether before or after the meeting where the agreement was allegedly made. (Cf. *Desny, supra*, 46 Cal.2d at p. 745 ["If the secretary had authority to receive and transmit messages to her employer ─ such as messages offering to sell a story embodying a writer's idea for a photoplay ─ and to take down in shorthand for transmission to her employer the script of a synopsis, she also necessarily

13

In concluding no agency relationship existed between Blum and Current, we likewise reject plaintiffs' alternative argument that Current should be estopped from challenging Blum's authority because Current never expressly disclaimed his authority to deal on its behalf. Under California agency law, Current's silence provides no basis for finding an agency relationship. (See *Goldman, supra,* 220 Cal.App.4th at p. 1172 ["[principal/husband] did not need to object [to wife's signing of documents admitting him to skilled nursing facilities] in order to preserve his right to make his own health care decisions"].)[9] "While no talismanic language is necessary for a principal to confer authority to an agent, some expression of the delegation is necessary." (*Goldman*, *supra*, 220 Cal.App.4th at p. 1173. Accord *van't Rood v. County of Santa Clara, supra,* 113 Cal. App. 4th at p. 572 ["a person does not become the agent of another simply by offering help or making a suggestion"].) Given the complete lack of evidence that Current – by words or actions – offered "some expression of the delegation" of authority to Blum to act on its behalf with respect to Terenzio's idea, the trial court correctly granted summary judgment on this ground.

Finally, these same basic principles dispose of plaintiffs' argument that *Blum* "underscored and ratified his apparent authority by confirming that he would propose Plaintiffs' ideas to Current's founder and decision maker, Gore, which Blum in fact did." As explained above, agency ratification must come from some affirmative conduct by the principal, not the agent. (*Goldman*, *supra*, 220 Cal.App.4th at pp. 1172-1173; see also Civ. Code, § 2310 [a principal may ratify an agency "by accepting or retaining the benefit of the act, with notice thereof"].)

---

had authority to receive and transmit the conditions and terms of the offer. Her knowledge of those terms and conditions is the knowledge of her employers"].)

[9] In *Flores*, the reviewing court affirmed a trial court finding that the husband lacked authority to enter agreements to arbitrate disputes with two nursing care facilities on behalf of his wife based upon the absence of any evidence the wife had conferred such authority on him. The court also rejected the nursing-facility defendants argument that the wife's subsequent signing of a power of attorney established her ratification of her husband's agreements on her behalf to arbitrate. (*Flores, supra*, 148 Cal.App.4th at pp. 587-589.)

14

**B. No Triable Issue Exists as to a Reasonable Expectation of Compensation.**

In any event, even assuming for the sake of argument that Blum could be deemed an agent of Current, plaintiffs' contract theory fails for yet another reason: There is no evidence Blum and Terenzio agreed, expressly or impliedly, that Terenzio would receive compensation for his submission of the Al Jazeera-Current sale idea. To the contrary, Nanula testified that he told Blum that Terenzio was an experienced television producer with interesting research and ideas about Al Jazeera "which might be a fit for Current and which Mr. Blum should hear." While Blum agreed to this suggestion and asked Nanula to have Terenzio contact him, neither Blum nor Nanula expressed any indication that Terenzio would be compensated for discussing his research or ideas. In fact, when asked about the July 2012 meeting during his deposition, Blum expressly denied saying or doing anything that "in your mind . . . would lead Mr. Terenzio to believe that you were empowered to enter into a contract on behalf of Current without consultation with anybody else."

Terenzio nonetheless points to the fact that, after the Al Jazeera-Current sale was consummated, Blum told Terenzio he believed Terenzio was entitled to a "finder's fee" for sharing his idea at the July 2012 meeting. However, the fact that Blum expressed his personal view that Terenzio deserved payment many months after he agreed to hear Terenzio's idea does not prove the existence of a triable issue with respect to whether Terenzio submitted the idea with the reasonable expectation of being paid for it, which is what the law required. (*Desny, supra*, 46 Cal.2d at p. 739; *Spinner, supra,* 215 Cal.App.4th at p. 184.)

At the same time, also lacking is any evidence that *Terenzio* said or did anything that would reasonably indicate he expected compensation for presenting his research or ideas to Blum. Under California law, "[b]ased on the clear holding of *Desny* an obligation to pay [cannot] be inferred from the mere fact of submission on a theory that everyone knows that the idea man expects to be paid." (*Faris, supra*, 97 Cal.App.3d at p. 319.) Thus, here, aside from Terenzio's own subjective belief that he deserved to be paid by Current for his idea, there is no evidence to establish what the law requires – to

15

wit, *a reasonable expectation of compensation.* (Cf. *Donahue, supra,* 245 Cal.App.2d at p. 606 [concluding the "many instances where compensation was discussed [between the idea recipient and plaintiff] are strong evidence that [the recipient] realized all along that plaintiffs expected to be paid for their idea"].)[10]

Finally, given our conclusion that summary judgment was properly granted to Current based upon the lack any triable issues regarding Blum's authority to bind Current in an implied agreement and regarding Terenzio's reasonable expectation of receiving compensation from Current (whether as a consultant, a finder, or something else), we need not address plaintiffs' alternative arguments that the trial court erred in finding no triable issue regarding Current's use of his idea and in finding that "plaintiffs had to adduce facts sufficient to support the existence of a Finder's agreement." Under well-established law, we will affirm a summary judgment if it is correct on any ground, "as we

---

[10] The parties dispute whether *Desny's* recognition of an implied contract based upon the submission of a creative idea extends beyond the entertainment industry. According to plaintiffs, *Desny* has been, and should be, applied outside the "Hollywood" context, citing *Gunther-Wahl Productions, Inc. v. Mattel Inc*. (2002) 104 Cal.App.4th 27, 29 (*Gunther-Wahl*), a case involving submission of ideas for an animated television series and related toy lines to a toy company executive described as "the gatekeeper or person to contact at Mattel." In *Gunther-Wahl*, similar to here, there was no discussion of compensation at the meeting during which the ideas were presented and the presenter admitted he never told defendant in words or substance that he must be paid if his ideas were used. However, unlike here, the plaintiffs presented testimony from an expert in the area of customs and practices of the children's entertainment licensing industry that "it would not be legitimate for the toy company to use information obtained in the pitch to influence or develop its own toys 'if it's a copy of the toy you brought in.' " This expert, an attorney, further testified "there's an ethical question about misappropriating someone else's property, rejecting it and then damaging the property of the seller that brought it to you.' According to [the expert], if the materials were used without any negotiations, it would be fair to assume the normal standard industry rate of 8 percent." (104 Cal.App.4th at p. 30 & fn. 4; accord *Montz v. Pilgrim Films & Television, Inc*. (9th Cir. 2011) 649 F.3d 975, 978-979 [noting that, in the film and television industries, writers "looking for someone to turn the written work into an entertainment production . . . often pitch scripts or concepts to producers with the understanding that the writer will be paid if the material is used"].) In our case, to the contrary, plaintiffs have offered no such evidence of an industry-wide practice of compensating those who present ideas relating to corporate mergers or acquisitions.

16

review the judgment, not its rationale." (*Overstock.com, Inc. v. Goldman Sachs & Co.* (2014) 231 Cal.App.4th 513, 528-529, fn. 10].)

## II.     The Remaining Issues On Appeal Are Moot.

Our holdings from above also dispose of several other contentions raised by plaintiffs on appeal. For example, plaintiffs contend the trial court failed to rule on their cause of action for quantum meruit. However, like implied contract, quantum meruit requires evidence of a plaintiff's reasonable expectation of receiving compensation for a service rendered. (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 458 ["[t]o recover in quantum meruit, a party need not prove the existence of a contract [citations], but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made' "].) Thus, because we find no triable issue with respect to Terenzio's reasonable expectation of compensation, there is basis for plaintiffs' recovery under the theory of quantum meruit.

Similarly, with respect to plaintiffs' contention the trial court should have granted their motion to compel and continued the summary judgment hearing to permit them to discover putative facts regarding Current's use of Terenzio's idea, we need not reach this issue given the lack of any triable issue regarding his reasonable expectation of compensation. Simply put, whether or not Current ultimately used Terenzio's idea, he is not entitled to be paid for submitting it to Current. (See *Donahue, supra*, 245 Cal.App.2d at p. 606 ["If the discloser of the idea must rely on circumstances to prove a promise, the mere fact 'that the idea has been conveyed, is valuable, and has been used for profit,' is insufficient"], quoting *Desny, supra*, 46 Cal.2d at p. 739.) Accordingly, no further discovery on this issue would help plaintiffs achieve a more favorable result.

17

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to Current.

_____
Jenkins, J.

We concur:


_____
Pollak, Acting P. J.


_____
Siggins, J.