Filed 7/19/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ESPLANADE PRODUCTIONS, INC., | B315859 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC693809) |
| v. | |
| THE WALT DISNEY COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dalila C. Lyons and Kevin C. Brazile, Judges.  Affirmed.

Drooz Legal and Deborah Drooz for Plaintiff and Appellant.

O'Melveny & Myers, Daniel M. Petrocelli, Drew E. Breuder and Craig P. Bloom for Defendants and Respondents.

_____

Esplanade Productions, Inc. sued The Walt Disney Company and affiliated entities (collectively Disney) for breach of an implied-in-fact contract, breach of confidence and unfair competition, alleging Disney had used the creative ideas of Esplanade's principal, Gary Goldman, in Disney's animated motion picture Zootopia without compensating Esplanade. The trial court sustained without leave to amend the demurrer of Disney regarding the individual elements of the works and the works as a whole, finding they were not substantially similar as a matter of law. The court overruled Disney's demurrer as to the title "Zootopia." Three years later the court granted the motion for summary judgment filed by Disney, ruling there was no evidence the creators of Disney's Zootopia had access to Goldman's work and, even if there was evidence of access, any inference of copying was rebutted by the undisputed evidence a Disney employee had independently created the title "Zootopia."

On appeal from the judgment entered in favor of Disney, Esplanade challenges the trial court's demurrer ruling and the grant of summary judgment. We affirm both rulings based on lack of access.[1]

---

[1] Because Esplanade would have been required to prove access to succeed on the claims dismissed after the demurrer ruling, any error in the sustaining of the demurrer was necessarily harmless. Accordingly, we do not address the demurrer ruling on the merits. (See *Cohen v. Kabbalah Centre Internat., Inc.* (2019) 35 Cal.App.5th 13, 23 [any error in order sustaining demurrer to cause of action was harmless where court correctly granted summary adjudication on claims with overlapping elements as claim dismissed on demurrer].)

2

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *Goldman's Treatment*

Goldman is a screenwriter who has written and produced several major motion pictures. In 1984 Goldman incorporated Esplanade to be the entity through which he would provide writing and producing services. Goldman has at all times been the director and sole shareholder of Esplanade.

In 2000 Goldman began developing an idea for a mixed live-action/animated movie called "Looney." Goldman wrote a "treatment" for the predominantly live-action portion of the film and registered the treatment with the Writer's Guild of America, West, Inc. in August 2000. The treatment consists of an eight-page summary, which tells the story of Zeke, a genius cartoonist, who is the writer, director, producer and (almost sole) voice-actor of an animated television show called "Zootopia" that has become a "worldwide sensation." The show is the "unique expression of [Zeke's] character," and he regularly holds conversations in the voices of his characters, even responding to one character voice with the voice of another character. Over the course of his career Zeke has gone from being "a nice, sweet, sensitive guy to being universally known as one of the biggest egomaniacs in Hollywood."

The action of the film begins with Zeke going through his morning routine, which establishes his enormous wealth, decadent lifestyle and tyrannical behavior. When he arrives at work, the viewer first sees the animated show, Zootopia. The Looney treatment describes Zootopia as, "Backstage at the zoo. Every morning, the animals punch in and go to work. At closing time, they punch out and go home. It's a metaphor for life and for America." The treatment lists nine animal characters: seven

teenagers (hyena, aardvark, sloth, koala, bear, cheetah, squirrel) and two adults (ibex and ostrich), as well as a human zookeeper. After that brief description of the show Zootopia, the Looney treatment continues describing the live-action plot. Zeke and his creative partner (and only friend), Robin, are visited by their hometown bully, whom Zeke proceeds to humiliate. Zeke is then called to a meeting with a studio executive who asks Zeke to endorse a product Zeke believes is harmful. Zeke refuses. Later that day Zeke publicly mocks the studio executive on a popular talk show. Zeke is fired the next day.

Thus begins Zeke's downfall. He learns he is broke; his wife leaves him; his so-called friends abandon him; he cannot get work; he fights with Robin, loses his house, gets arrested and, left with no alternative, returns home to his parents' house in Kansas. Throughout his hardships Zeke is haunted by his animated characters, who follow him like an entourage that only he can see. As his mental state devolves, Robin visits Kansas with her new fiancé, the childhood bully. Zeke realizes he is in love with Robin, but she rejects him. Zeke is ultimately committed to a psychiatric facility where he recognizes that his "characters are all him. And he has to master them, integrate them." Zeke returns to Hollywood, again professes his love to Robin; and, after some dramatic tension and uncertainty, she leaves the bully at the altar to be with Zeke.

In addition to the Looney treatment Goldman prepared a six-page description of the animated characters who populated the Zootopia show-within-the-film. The five main characters are a koala, hyena, aardvark, sloth and squirrel; all between the ages of 14 and 17. The koala is the leader of the group. He "looks cute, but he's . . . consumed with unbridled ambition." He

concocts "wild schemes" to challenge the bear for leadership of the animals and to win the affections of the attractive cheetah. The hyena is described as "[a] prankster. A jolly guy, out for a good time." He is an outcast "totally without hope of ever changing that situation or living a normal life." He "revels in being offensive" and "takes pride in his obnoxious behavior." The hyena also has a "volcanic libido" but has "no hope of fulfilling it with an actual female." The third member of the clique is the aardvark, a "strong, athletic, but dorky guy who is obsessed with self-improvement." He believes "an animal can be whatever he wants to be" and "[t]here is no such thing as 'animal nature.' 'If you want to be an elephant, you can be an elephant.'" The sloth is a "highly educated and cultured epicure who is monumentally lazy." He "has no hope that he can change or improve; or that anyone else can change or improve." The final main character is the only wild animal on the show: the squirrel, who can enter and exit the zoo as she pleases. She is "cute, curvaceous, sexy," self-sufficient and "the voice of common-sense." But no matter what advice she gives based on her knowledge of the outside world, the zoo animals "laugh her off as being absurd." The squirrel is romantic and "could almost fall for" any of the males; but they "treasure her as a friend, just not as a lover."

The show's supporting characters are the bear, cheetah, ibex and ostrich. The bear is a football player who takes his leadership for granted. The cheetah is a "[g]orgeous sex goddess cheerleader" who constantly tries to make the bear jealous. The ibex is an adult character who runs a bar frequented by the characters and is married to the other adult character, the ostrich. The ostrich is "very prissy and vain, but not too attractive."

Goldman envisioned the Looney film as being the first installment of a franchise that introduced his Zootopia characters. He then hoped to write and produce an animated spin-off starring the Zootopia characters.

2. *Goldman's Looney / Zootopia Pitch*

In 2009 Goldman was developing a live-action film with Brigham Taylor, who at the time was a production and development executive with Walt Disney Pictures. According to Goldman, after one of their meetings regarding the live-action project, Goldman told Taylor about Looney/Zootopia and gave Taylor copies of the Looney treatment, Zootopia character descriptions, copies of animated character drawings Goldman had commissioned, a two-page synopsis of the Looney plot and two one-page "teasers" even more briefly summarizing the plot of Looney (collectively the "pitch materials"). Goldman alleges Taylor agreed to show the pitch materials to Disney's animation department. Subsequently Taylor informed Goldman that Disney's animation department was not interested in the Looney/Zootopia story.

3. *Disney's Zootopia (Spoiler Alert)*

At some point after 2009 Disney began developing an animated film about a civilization comprised entirely of anthropomorphic animals who had evolved beyond being predator and prey and instead coexisted (mostly) peacefully in a modern world. The project went through several iterations, beginning as a spy movie set on an island with a fox protagonist and ultimately becoming a buddy-cop movie with a rabbit as the main protagonist and the fox as her reluctant partner. The movie was released in 2016 and earned more than $1 billion in box office revenue.

The plot of Disney's Zootopia centers on a young rabbit named Judy from the agricultural suburb of Bunnyburrow. In the prologue the viewer sees Judy as a child in a school play. She explains to the audience that animals have "moved beyond our primitive savage ways" and "predator and prey live in harmony." Judy says she wants to be a police officer when she grows up, despite her concerned parents' reminder that, "There's never been a bunny cop." It's not clear whether Judy registers her parents' apprehension because she scampers off to defend her friends against a bully (who happens to be a fox). The bully tells Judy that she will never be anything more than "just a stupid, carrot farming dumb bunny."

The movie then jumps ahead to show a young-adult Judy completing and graduating from the police academy. She is assigned to work in the "big city" of Zootopia. As she boards the train to Zootopia, Judy's parents again express concern about the predators in the city, particularly the foxes. They attempt to give her fox deterrent, fox repellent and a fox taser. She placatingly accepts the fox repellent and jumps onto the train.

When she reports to the police station for her first day, a cheetah officer marvels at the "cute" bunny cop. Judy politely explains that "a bunny can call another bunny 'cute' but when other animals do it, it's a little . . . ." The cheetah understands and interrupts to apologize for "stereotyping" her. At the morning briefing Judy learns 14 mammals, all predators, have recently gone missing. But instead of being assigned to those cases, Judy, much to her chagrin, is tasked with parking enforcement.

While enthusiastically writing parking tickets Judy sees a fox, who we later learn is named Nick, go into an ice cream parlor

in which the employees and patrons are all elephants. Suspicious, she follows. Judy enters just as the proprietor refuses to serve Nick, asking, "There aren't any fox ice cream joints in your part of town?" Judy begins to reach for her fox repellent when she notices Nick is with his toddler son who is wearing an elephant costume. Nick explains his son wants to be an elephant when he grows up. Judy intervenes and convinces the elephant to serve Nick. When Nick realizes he has forgotten his wallet, Judy buys a "jumbo pop" for the child. As they part ways, Judy tells the child, "[Y]ou want to be an elephant when you grow up, you be an elephant—because this is Zootopia, anyone can be anything."

Later that afternoon, Judy sees Nick and his son melting the jumbo pop in the sun. She watches as they re-freeze the liquid into smaller popsicles, sell them to lemmings, salvage the used popsicle sticks and sell the sticks to a rodent construction site. Judy also discovers Nick's "son" is in fact an adult fennec fox. Judy confronts Nick, who mischievously explains he has not broken any laws and tells her, "[E]veryone comes to Zootopia thinking they can be anything they want. Well you can't. You can only be what you are. (Points to himself) Sly fox. (Points to her) Dumb bunny."

The next day Judy convinces the police chief to let her work on one of the missing mammal cases. He gives her 48 hours to solve the case, or she must resign. Looking at a surveillance photograph Judy realizes Nick was nearby where the missing mammal (an otter) was last seen. She finds Nick and blackmails him into helping her find the otter. Begrudgingly, Nick agrees.

Together, Judy and Nick follow a series of leads and have several adventures, ultimately leading them to an abandoned

asylum where they find all of the missing mammals being held in cells. The animals all appear violent as though they have become feral and savage. Judy and Nick hear voices and hide. The mayor of Zootopia (a lion) and a doctor (a badger) enter. The mayor is angry that the doctor has not discovered why the captured animals have "gone off the rails crazy." The doctor observes that only predators have been affected and perhaps it is due to their "biology."

Judy and Nick apprehend the mayor, and Judy is celebrated for her efforts. During a press conference, when asked what caused the animals to "go savage," Judy struggles to answer. She repeats what she overheard the doctor say, that it may have something to do with their biology as predators. Nick, upset and offended by Judy's comments, tells her he thought she believed he was more than a savage predator. A montage shows tensions rising between predator and prey in Zootopia. Feeling guilty, Judy resigns from the police force and returns to Bunnyburrow.

While with her family, Judy realizes there is a plant that causes animals to act savagely, and she surmises the savage predators have been drugged. She races back to Zootopia to find Nick and apologize. Now reconciled, Judy and Nick discover that the assistant mayor, a sheep, has been surreptitiously drugging predators to sow discord so that prey animals can have more power. Judy and Nick work together to capture the assistant mayor; the savage animals are cured; Judy gets her job back; Nick joins the police force as the first fox police officer; and predators and prey once again live in harmony in Zootopia.

4. *Esplanade's Complaint*

In March 2017 Esplanade sued Disney in federal court alleging federal copyright infringement as well as state law claims. In November 2017 the district court granted Disney's motion to dismiss the federal claim and declined to exercise supplemental jurisdiction over the state law claims, which were dismissed without prejudice. (See *Esplanade Productions, Inc. v. The Walt Disney Company* (C.D.Cal. Nov. 8, 2017, CV-17-02185-MWF (JCx)) 2017 U.S.Dist. Lexis 217700.)[2]

Esplanade filed the complaint in this action on February 13, 2018, alleging breach of implied-in-fact contract, breach of confidence and violation of California's unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), naming as defendants The Walt Disney Company and a number of its affiliates and subsidiaries.[3] Esplanade alleged Disney had

---

[2] The district court found that "Goldman's work and *Zootopia* are dissimilar in almost every material respect." (*Esplanade Productions, Inc. v. The Walt Disney Company*, *supra,* 2017 U.S.Dist. Lexis 217700 at p.*50.) For example, "Esplanade's effort to make the plots of *Looney* and [Disney's] *Zootopia* seem similar are strained" and, even if similar thematic elements could be detected, they were "broad and well-worn" and not protectable by federal copyright law. (*Id.* at pp.*29-30.) The dismissal was affirmed on appeal. (See *Esplanade Productions, Inc. v. The Walt Disney Company* (9th Cir. 2019) 768 Fed. Appx. 732.)

[3] In addition to The Walt Disney Company, the complaint named as defendants: Disney Enterprises, Inc.; Walt Disney Pictures; ABC, Inc.; Buena Vista Home Entertainment, Inc.; Disney Consumer Products, Inc.; Disney Consumer Products and Interactive Media, Inc.; Disney Book Group, LLC; Buena Vista

used Goldman's work to develop Zootopia as evidenced by the works' similar titles; artwork; dialogue; themes; characters; settings; plot and sequence of events; mood; and selection, arrangement and combination of elements. For example, the complaint alleged, "Disney adapted the small-town human creator of [Goldman's] *Zootopia,* who goes to the big city to fulfill his wild ambition in the field of animation, into a cartoon character, Judy, who goes to the big city with a similarly wild ambition, to succeed as a cop." The works also shared material thematic elements, the complaint alleged, such as the idea "that 'anyone can be anything,' one can 'define who you are,' and one can overcome the prejudices of other people and what they think you 'should be' or what they believe you are capable of." Esplanade's complaint also alleged similarities in the visual and personality characteristics of the characters. For example, according to Esplanade, Judy is visually similar to the drawing of Goldman's squirrel character and both are "at the bottom of [Zootopia's] status and power hierarchies." Esplanade also alleged Judy was similar to the Goldman's aardvark because both are "good natured, kindhearted, and constantly trying to improve" themselves. Nick is compared physically to Goldman's hyena because both are "dog-like predators who appear sly, cynical, and untrustworthy." Nick's personality is alleged to be similar both to Goldman's hyena and sloth because Nick has resigned himself to being an outcast, is "uncouth" and is a prankster who "takes pride in [his] obnoxious behavior."

Books, Inc.; Disney Interactive Studios, Inc.; Disney Store USA, LLC and Disney Shopping, Inc.

5. *Disney's Demurrer*

Disney demurred to the complaint, arguing Esplanade had failed to allege facts showing Goldman's work was substantially similar to Disney's Zootopia, as required to state a claim for all three causes of action alleged. Disney reviewed the differences between the works' plot, sequence, visual depictions, character traits, settings, dialogue, themes and mood, arguing that, even if Esplanade could find high-level similarities between the works, it was only because it had mischaracterized them.

The trial court, having viewed the Zootopia movie and reviewed Goldman's pitch materials, agreed with Disney that the material elements, other than the title "Zootopia," were not substantially similar.[4] The court undertook a detailed analysis of the works and found, while there were some similarities of "general, common abstract themes" at "the highest level of abstraction," such similarities were not legally sufficient to establish the "substantial similarity" required to infer Disney had copied Goldman's work. Accordingly, the court sustained the demurrer without leave to amend as to claims Disney had copied Goldman's work as a whole or its dialogue, plot, sequence, artwork, character traits, settings, themes or mood. The court overruled the demurrer as to whether Disney had copied the title "Zootopia."

6. *Disney's Summary Judgment Motion*

Disney moved for summary judgment in December 2020. It argued the undisputed evidence established the creators of

---

[4] The trial court took judicial notice of the Zootopia movie and the Goldman pitch materials in response to Disney's unopposed request.

12

Disney's Zootopia did not have access to Goldman's pitch materials and, therefore, could not have copied the title "Zootopia." Further, Disney argued, even if there had been access, there was undisputed evidence the title "Zootopia" had been independently created by Byron Howard, a director at Walt Disney Animation Studios and the co-writer and co-director of Disney's Zootopia.

In support of its motion Disney submitted a declaration from Taylor and excerpts from his deposition. Taylor stated he had no memory of Goldman telling him about Looney/Zootopia. Even if Goldman had done so, Taylor never sent any materials to Disney's animation department on behalf of Goldman because Taylor knew the animation department did not accept pitches from nonemployees. Taylor also said he had never met Jared Bush, the co-writer and co-director of Disney's Zootopia. Taylor had met Howard briefly at a publicity event in 2016, but he had never worked with him. Taylor had no involvement in the development or production of Disney's Zootopia.

Disney also submitted a declaration from Howard, as well as excerpts from his deposition. Howard maintained he had never worked with Taylor and had never seen Goldman's pitch materials until this lawsuit. He also stated Disney's policy was not to accept submissions from outside writers and he never reviewed such unsolicited material. Howard explained that prior to 2012 the title of the Zootopia project had been "Savage Seas" and then "Savage City." In 2012 an executive suggested they change the name to better reflect the themes of the film, which Howard described as bias, utopia, conflict between species and natural enemies. Howard spent less then an hour brainstorming potential new titles. One of the titles he came up with was

13

"Zootopia," which he described as a combination of the words "zoology" and "utopia."

In his deposition testimony and declaration Bush also stated he had never met Taylor and had never seen the Goldman pitch materials until this lawsuit. He corroborated Howard's explanation for how the title "Zootopia" came about. Disney also submitted excerpts from the deposition of John Lasseter, a former Disney executive. Lasseter similarly recalled Howard creating the Zootopia title after another executive suggested they rename the film. Finally, Disney submitted the declaration of Jessica Julius, a vice-president of creative development at Walt Disney Animation Studios. Julius explained that Disney Animation maintains a database of all scripts, treatments and pitch materials it receives. Entries in the database go back at least 25 years. After this lawsuit commenced, Julius reviewed the database and was unable to find any entries related to Goldman's Looney/Zootopia.

In opposition to the summary judgment motion Esplanade argued triable issues of material fact existed as to whether Disney copied the title "Zootopia." Regarding Disney's alleged access to Goldman's pitch materials Esplanade submitted Goldman's declaration and deposition excerpts in which Goldman recalled pitching Looney/Zootopia to Taylor in 2009 and Taylor told Goldman he would submit the materials to the animation department. Further, Esplanade argued there was a "reasonable possibility" Taylor transmitted Goldman's ideas to Lasseter because Lasseter provided creative input on three live-action projects on which Taylor was working during roughly 2009 to 2011. Alternatively, Taylor could have transmitted the pitch materials to Disney executive Andrew Stanton, with whom

Taylor worked on a live-action film in that time frame. Stanton then could have passed Goldman's ideas to the Zootopia team when he provided creative feedback to them in 2014. Finally, Esplanade argued the evidence did not conclusively demonstrate Howard had independently created the title "Zootopia" because the evidence could be rationally disbelieved.

The trial court granted summary judgment in favor of Disney, concluding the undisputed evidence showed no nexus between Taylor and the creators of Disney's Zootopia that could support an inference Disney used Goldman's work in creating the title of the film. In addition, the court found the undisputed evidence established Howard had independently created the title "Zootopia."

The court entered judgment in favor of Disney on July 28, 2021. Esplanade filed a timely notice of appeal.

## DISCUSSION

1. *Standard of Review*

A motion for summary judgment is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review a grant of summary judgment de novo (*Samara v. Matar* (2018) 5 Cal.5th 322, 338) and, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in favor of that party (*Weiss v. People ex rel. Dept. of Transportation* (2020) 9 Cal.5th 840, 864; *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618), decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Hampton v. County of San Diego* (2015)

62 Cal.4th 340, 347; *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618.)

When a defendant moves for summary judgment in a situation in which the plaintiff would have the burden of proof at trial by a preponderance of the evidence, the defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action. Alternatively, the defendant may present evidence to "'show[ ] that one or more elements of the cause of action . . . cannot be established' by the plaintiff." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853; accord, *Regents of University of California v. Superior Court*, *supra*, 4 Cal.5th at p. 618 ["[a] defendant seeking summary judgment must show that the plaintiff cannot establish at least one element of the cause of action"]; see Code Civ. Proc., § 437c, subd. (p)(2).) "The moving party bears the burden of showing the court that the plaintiff has not established, and cannot reasonably expect to establish, the elements of his or her cause of action." (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 705, internal quotation marks omitted; accord, *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720; see *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 ["the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence'"].)

Once the defendant's initial burden has been carried, the burden shifts to the plaintiff to demonstrate, by reference to specific facts, not just allegations in the pleadings, there is a

16

triable issue of material fact as to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof" at trial. (*Aguilar*, at p. 850; accord, *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 722.)

    2. *Governing Law*

    Ideas, generally, are not subject to common law or statutory copyright protection. (See *Desny v. Wilder* (1956) 46 Cal.2d 715, 731-732 ["'[t]he general rule of law is, that the noblest of human productions—knowledge, truths ascertained, conceptions, and ideas—become after voluntary communication to others, free as the air to common use'"]; *Spinner v. American Broadcasting Companies, Inc.* (2013) 215 Cal.App.4th 172, 184 (*Spinner*) ["[g]enerally, there is no property right in an idea"].) However, California courts have recognized "that an idea can be the subject of an express or implied contract, and its disclosure and submission can be consideration for a promise to pay compensation. Plaintiffs may therefore have a cause of action in contract for disclosing an idea to a defendant that uses that idea without compensation." (*Spinner*, at p. 184; accord, *Desny*, at p. 733 ["'[t]he policy that precludes protection of an abstract idea by copyright does not prevent its protection by contract'"].)

    Where, as here, there is no express agreement for compensation for an idea, plaintiffs can prevail on a cause of action for breach of an implied-in-fact contract by showing: "(1) they clearly conditioned the submission of their ideas on an obligation to pay for any use of their ideas; (2) the defendants,

17

knowing this condition before the plaintiffs disclosed the ideas, voluntarily accepted the submission of the ideas; and (3) the defendants found the ideas valuable and *actually used* them—that is, the defendants based their work substantially on the plaintiffs' ideas, rather than on their own ideas or ideas from other sources." (*Spinner*, *supra*, 215 Cal.App.4th at p. 184; accord, *Mann v. Columbia Pictures, Inc.* (1982) 128 Cal.App.3d 628, 646.)  Esplanade's breach of confidence and unfair competition claims similarly require it to show Disney actually used Goldman's ideas.  (See *Hollywood Screentest of America, Inc. v. NBC Universal, Inc.* (2007) 151 Cal.App.4th 631, 649, 651.)

Because direct evidence of a defendant's use of a plaintiff's work is rare, a plaintiff may raise an inference of use by "showing the defendant[ ] had access to [the plaintiff's] ideas and the defendant['s] work is substantially similar to the plaintiff['s] ideas." (*Spinner*, *supra,* 215 Cal.App.4th at pp. 184-185; accord, *Ryder v. Lightstorm Entertainment, Inc.* (2016) 246 Cal.App.4th 1064, 1073; *Hollywood Screentest of America, Inc. v. NBC Universal, Inc., supra,* 151 Cal.App.4th at p. 646.)  An inference of use may be refuted by evidence "that conclusively demonstrates the defendants independently created their product." (*Spinner*, at p. 185.)

3. *Judgment Was Properly Entered in Favor of Disney Based on Lack of Access to Goldman's Work*

For purposes of summary judgment Disney does not dispute the parties' mutual understanding that any submission of ideas by Goldman was conditioned on compensation should those ideas be used by Disney.  Disney also concedes the substantial similarity between the title "Zootopia" in both its film and Goldman's pitch materials.  Accordingly, the only question to be

18

resolved at summary judgment was whether Esplanade could show the creators of Disney's Zootopia had access to Goldman's work[5] and could therefore, coupled with the evidence of substantial similarity, establish an inference Disney had used (or copied) the pitch materials in creating the title "Zootopia."

In order to establish access sufficient to raise an inference of use, Esplanade must show the creators of Disney's Zootopia "had an opportunity to view or to copy" Goldman's work. (*Spinner, supra,* 215 Cal.App.4th at p. 186.) "More than a "'bare possibility'" of access is required." (*Ibid.*; accord, *Mann v. Columbia Pictures, Inc., supra,* 128 Cal.App.3d at p. 651 ["'[t]here

_____

[5] While not explicitly argued by Esplanade on appeal, some federal courts have found evidence of access is not required to raise an inference of use where two works are "so strikingly similar as to preclude the possibility of independent creation." (*Meta-Film Associates, Inc. v. MCA, Inc.* (C.D.Cal. 1984) 586 F.Supp. 1346, 1355; see also 5 Nimmer on Copyright (2023) § 19D.07 ["'[s]triking' similarities from which such an inference may be drawn are similarities of the kind that cannot be explained, in the normal course of human events, by the possibilities of independent creation, coincidence or prior common source"].) Even if we were to adopt the "striking similarity" exception to the access requirement, both works use of the word "Zootopia" does not preclude the possibility of independent creation or coincidence. The portmanteau of the words "zoo" or "zoology" and "utopia" is not so exceptional on its own to raise an inference of copying, as shown by evidence in the record that the word was used by a New York radio station as the name of a concert in 2000 and by a Texas zoo for the name of an event also in 2000. Nor is it surprising that a Disney employee would blend the word "utopia" with another word given one of Disneyland's original 1955 rides is named "Autopia," which is itself a combination of "automobile" and "utopia."

must be a reasonable possibility of viewing plaintiff's work—not a bare possibility"].)  Standing alone, submission of a plaintiff's work to the company whose employees are alleged to have copied it is insufficient to establish access.  (*Spinner,* at p. 186.)  "A reasonable possibility of access requires a sufficiently strong nexus between the intermediary to whom the plaintiffs submitted their work and the creator of the allegedly offending work.  [Citations.]  The relationship linking the intermediary and the creator should be more than the simple fact that they share a common employer.  [Citation.]  For instance, the nexus may be sufficiently strong when the intermediary was in a position to transmit the plaintiffs' work to the creator, was a supervisor with responsibility for the creator's work, was part of the same work unit, was a contributor of creative ideas or material to the creator's work, or was otherwise in contact with the creator regarding some subject matter that overlapped with the plaintiffs' work.  [Citation.]  In other words, the intermediary and the alleged copier occupy positions such that it is natural for one to impart information to the other."  (*Id.* at pp. 186-187.)

Esplanade argues it sufficiently created a triable issue of material fact regarding access because the evidence showed Goldman submitted his materials to Taylor and Taylor said he would forward them to the animation department.  However, that evidence establishes nothing more than bare corporate receipt of the materials.  Even if Taylor did submit Goldman's pitch materials to an unknown individual within Disney's animation department, there is no evidence any creator of Disney's Zootopia ever saw the pitch materials or discussed the project with Taylor.  To the contrary, Howard, Bush and Lasseter each testified he had never seen the pitch materials or had any conversations with

Taylor regarding Zootopia. Nor is there any evidence Taylor regularly contributed ideas or material to Howard, Bush or Lasseter such that it would be natural for him to share the pitch materials.

Esplanade focuses on the relationship between Lasseter and Taylor, arguing they "collaborated closely" on certain live action films. This statement is not supported by the evidence. Taylor testified Lasseter "consulted" on three of Taylor's films, providing creative feedback and opinions on a few occasions. Lasseter also stated he generally consulted on certain films but did not mention any relationship with Taylor. Nothing in the record suggested a relationship existed between the men in which they regularly collaborated or shared ideas for new material such that Taylor would have reason to discuss Zootopia with Lasseter.

Even more tenuous is Esplanade's argument that Taylor could have given Goldman's pitch materials to Stanton, who then worked with Lasseter on other films and also provided commentary on Zootopia in 2014. There is simply no evidence Taylor and Stanton would have had reason to discuss an animation project, nor is there evidence Stanton would have occasion to share that information with Lasseter or others working on Zootopia. Esplanade's access argument relies solely on speculation and conjecture arising from the fact that some of the individuals involved occasionally provided feedback on one another's work. That is insufficient as a matter of law to establish access.[6] (See *Spinner, supra,* 215 Cal.App.4th at p. 187 ["Spinner's evidence is insufficient as a matter of law because he

---

[6] Because we find no inference of use, we need not address whether summary judgment was properly granted on the issue of independent creation.

relies on a bare possibility of theoretical access premised on mere speculation"]; see also *Meta-Film Associates, Inc. v. MCA, Inc.* (1984) 586 F.Supp. 1346, 1355 ["tortuous chain of hypothetical transmittals" insufficient to establish access].)

## DISPOSITION

The judgment is affirmed.  Disney is to recover its costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.

ESCALANTE, J.*

---